Rosemary M. Rivas (State Bar No. 209147)
rrivas@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
505 Montgomery Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Additional Counsel Listed on Signature Page

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY JANE JASIN and THOMAS JASIN | Civil Action No. |
| Plaintiffs, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| VIVUS, INC., LELAND F. WILSON, TIMOTHY MORRIS, and PETER Y. TAM | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs MARY JANE JASIN and THOMAS JASIN ("Plaintiffs"), by and through their attorneys, allege the following upon investigation of counsel and upon information and belief, except as to the allegations which pertain to Plaintiffs, which allegations are based upon personal knowledge, as follows:

### NATURE OF ACTION

1.      Plaintiffs bring this action as common stock holders of Vivus, Inc. ("Vivus" or the "Company") against the Company and certain former officers and members of its Board of Directors who profited at Plaintiffs' expense by misrepresenting the Company's prospects for success. Plaintiffs

1

seek damages, equitable and other appropriate relief for the Defendants' violations of federal law arising from their misrepresentations and omissions of material fact.

2.      Vivus is a biopharmaceutical company dedicated to the development and commercialization of therapeutic drugs for large underserved markets, including obesity and related morbidities, such as sleep apnea and diabetes and men's sexual health. Immediately prior to and during the period at issue in this Complaint, Vivus and its executives were busy seeking FDA approval of its obesity drug Qsymia (also known as Qnexa) and to bring the product to market in the United States soon afterward. While Vivus and its executives made optimistic predictions about the Company's likely success in these endeavors to the public, behind the scenes Defendants expected the worst and were busy protecting their personal assets by liquidating their positions in the Company.

3.      Throughout 2012, Defendants failed to disclose material adverse facts about the Company's financial well-being and future prospects. Specifically, Defendants misrepresented and/or failed to disclose that:

    a.  Vivus's patent for Qsymia was at risk of patent infringement, freedom-to-operate challenges, and potentially not enforceable due to prior art;

    b.  The European Union's medical regulatory agency, known as the European Medical Agency ("EMA") was unlikely to approve Qsymia for sale in Europe without the drug first passing certain cardiovascular studies;

    c.  Vivus failed to enlist sufficient pharmacies to sell Qsymia at the drug's commercial launch, thus dooming the financial results of the launch;

    d.  Vivus would offer additional common stock prior to April 17, 2012 and thus dilute the value of existing issued shares.

4.      Because of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs have suffered significant losses and damages.

## JURISDICTION AND VENUE

5.      This action arises under Section 10(b) of the Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §

240.10b-5, promulgated thereunder. This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because substantial acts in furtherance of the alleged fraud or the effect of the fraud occurred in this District. In addition, many of the acts and practices made in furtherance of Defendants' scheme and complained of herein occurred in substantial part and/or had an effect in this District. Further, Defendants conducted substantial business within this District.

7.     In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone, and Internet communications.

## PARTIES

8.     Plaintiffs are individual investors, residing in Lancaster, Pennsylvania, who invested over $2,800,000 in Vivus stock during 2012. During the period at issue in this Complaint, Plaintiffs communicated directly with Vivus's Officers and Directors in California, and relied upon their direct statements to them, statements in public, as well as other publicly available information, in deciding to purchase, hold, and trade in Vivus stock and options.

9.     Defendant Vivus (NASDAQ: VVUS) is a corporation organized and existing under the laws of the State of Delaware. It maintains a principal place of business at 1172 Castro Street, Mountain View, CA. 94040. Vivus is a biopharmaceutical company dedicated to the development and commercialization of therapeutic drugs for large underserved markets, including obesity and related morbidities, such as sleep apnea, diabetes, and men's sexual health. The Company currently has two products for sale on the market in the United States: Qsymia and Stendra. Qsymia was one of the first weight-loss related drugs approved for sale in the United States in 13 years. Stendra is an erectile dysfunction drug.

10.     Defendant Leland F. Wilson ("Wilson") was a Director of the Company during the period relevant to this suit. Wilson was also the Chief Executive Officer of the Company. According to the Schedule 14A filed on Form DEFC14A with the United States S.E.C. on June 3, 2013, ("the Proxy"), Wilson's 2012 base salary was $738,000. In addition, he received $405,900 in target bonus as a result of

Complaint for Violations of the Federal Securities Laws

the FDA's approval of Qsymia and Stendra. Defendant Wilson also received $2,742,717 in stock awards. In total, defendant Wilson received $3,898,394 in compensation, including $11,777 in 401(k) Plan contributions, paid by the Company during the fiscal year ended December 31, 2012. During a six month period in 2012 when Vivus common stock traded for its historically highest prices, defendant Wilson acquired 400,000 common shares through the exercise of stock options and realized an aggregate of $8,441,745.70 as a result of the sale of those same shares during this period of insider trading.

11.     Defendant Peter Y. Tam ("Tam") was Vivus President and a Director of the Company during the period relevant to this suit. According to the Proxy, defendant Tam's base salary was $545,012. In addition, Tam received $122,628 as part of the Company's Annual Bonus Plan and $272,506 in target bonus as a result of the FDA's approval of Qsymia and Stendra. Defendant Tam also received $894,053 in stock awards, "the grant date air value computed in accordance with FASB ASC Topic 718." In total, defendant Tam received $1,846,388 in compensation, including $12,189 in 401(k) Plan contributions, paid by the Company during the fiscal year ended December 31, 2012. During a six month period in 2012 when Vivus common stock traded for its historically highest prices, defendant Tam acquired 300,890 common shares through the exercise of stock options and, along with 60,000 shares previously acquired, realized an aggregate of $8,139,543.20 as a result of the sale of such shares during this period of insider trading.

12.     Defendant Timothy Morris ("Morris") was the Chief Financial Officer and Senior Vice President of Finance and Global Corporate Development during the period relevant to this suit. Plaintiff Thomas Jasin engaged in direct contact with Morris during the time period relevant to this litigation, and was given misleading and incomplete information. According to the Proxy, defendant Morris's 2012 base salary was $433,563. In addition, Morris received $251,466 in target bonus payments as a result of the FDA's approval of Qsymia and Stendra. Defendant Morris also received $759,101 in stock awards, "the grant date fair value computed in accordance with FASB ASC Topic 718." In total, defendant Morris received $1,467,427 in compensation, including $23,297 in certain benefits, paid by the Company during the fiscal year ended December 31, 2012. During a six month period in 2012 when Vivus common stock traded for its historically highest prices, defendant Morris acquired 354,358

common shares through the exercise of stock options and realized an aggregate of $5,956,581.32 as a result of the sale of those same shares during this period of insider trading..

13. Defendants referenced in ¶¶ 7 to 12 are collectively referred to as the "Individual Defendants"

## SUBSTANTIVE ALLEGATIONS

### I. Background

#### a. Vivus

14. Leading up to 2012, Vivus planned to obtain FDA and European Union approval for its obesity drug Qsymia. On November 3, 2011, Vivus issued a press release noting that the FDA had accepted the Company's New Drug Application ("NDA") for Qsymia, intimating that the market for the drug consisted of an estimated 80 million adults in the United States.

15. On November 8, 2011, the Company filed its Form 10-Q with the SEC for the period ending September 30, 2011, which announced a decreased loss from the prior year. The Company's stock climbed to over $10 per share. After increasing throughout the year to a high of $31.28 on July 18, 2012 in anticipation of a successful launch, Vivus closed the year 2012 with its stock again at just under $10 per share.

16. During late 2011 and continuing into 2012, Vivus and the Individual Defendants misrepresented and failed to disclose material facts relating to the financial viability and likelihood of success of the Company's upcoming launch of Qsymia in the United States and in the European Union. Specifically, Vivus and the Individual Defendants misrepresented and failed to disclose, *inter alia*, the following material facts:

    a.  Vivus's patent for Qsymia was at risk and potentially not enforceable due to prior art;

    b.  The European Union's medical regulatory agency, the EMA, was unlikely to approve Qsymia for sale in Europe;

    c.  Vivus failed to enlist sufficient pharmacies to sell Qsymia at the drug's commercial launch, thus dooming the financial results of the launch;

    d.  Vivus would offer additional common stock prior to April 17, 2012 and thus dilute the value of existing issued shares.

Complaint for Violations of the Federal Securities Laws

17.     Vivus and the Individual Defendants' material misrepresentations and omissions about the above subjects (and other subjects) damaged Plaintiffs directly by causing them to purchase Company shares from insiders and others at inflated prices. Even after Plaintiffs started purchasing stock and reached out to Individual Defendants directly for further information, those Individual Defendants misrepresented and failed to disclose material information during the course of communications, thus causing Plaintiffs to continue to purchase more shares and options at inflated prices.

18.     By the time the facts were finally revealed, Plaintiffs had lost more than $2,800,000 – substantially all their life savings – through their investments in the Company's stock. Only later, in 2013, did Plaintiffs learn the truth about Vivus's prospects during 2012. The plaintiffs lost all of those savings because of Defendants' willful participation in Vivus's material misrepresentations and omissions.

### b.  Launching New Pharmaceuticals

19.     The launching of a new pharmaceutical is a very expensive endeavor whose success hinges on the first six months of the product's commercialization.

20.     As an October 2008, *In Vivo* report entitled "Blow the Launch – Doom the Product" by Sarah Rickwood stated: "Whatever happens in the first six months of a product's commercialization will impact its commercial performance for the rest of its patented life." This conclusion was reached after "studying the market share uptake curves over two years of the hundreds of launches" in eight countries (Canada, France, Germany, Italy, Japan, Spain, the United Kingdom, and the United States).

21.     In April 2010, an *In Vivo* report titled "Rising Payor Influence Means Successful Drug Launches are Rarer" confirmed the trend discussed in the 2008 *In Vivo* report:

> The latest IMS Launch Excellence study also confirms a fundamental rule across all eight countries: drug firms have only six months to make their product a success. Over three quarters of new drug launches don't change the rate of market share acquisition established in the first six months….If they did well then, they continue to do well. If they did poorly, they continue to do poorly. Only rarely do they start poorly and then dramatically improve after six months. Our latest study finds that fewer than 20% of launches significantly improve their uptake trajectory between six and 18 months on the market.

22.     The April 2010 report went on to discuss the need for companies to take significant pre-launch steps at least a year before the launch to help ensure its success: "Companies must not only

Complaint for Violations of the Federal Securities Laws

secure a positive opinion from national payors as early as possible, but also need to woo local payor decision makers a year before launch in order to open the door to doctors' actually prescribing a new product when it does become available."

23.     The need to monetize Qsymia was even more acute for Vivus, which only had eight years (of a potential total of 20 years) remaining on its patent at the time it launched Qsymia in the United States.

## II.  Misrepresentations and Insider Sales

24.     On February 27, 2012, Wilson, Vivus's Chief Executive Officer, was interviewed on CNBC on the Fast Money Halftime Show. Just a week before, an FDA panel had recommended full approval of Qsymia for sale in the United States and shares had been up more than 125% since that time. On the air, Wilson predicted that the FDA would approve the drug in April of 2012. Acknowledging the large potential market for the drug and the fact that Vivus was a small company, Wilson was asked whether they were seeking a partner to market the drug, and whether they would need to raise capital. Wilson stated that:

> We're looking for a partner for the rest of the world outside of the United States. We believe that will be a major pharmaceutical company to reap most of the countries around the world. In the United States we're going to launch this product on our own. We believe we have the best understanding of this drug and how to best position this product for its long-term success. We've assembled a marketing team and feel confident we can launch the product.

25.     Regarding financing, Wilson stated that "it does take money to launch products, but we have $145 million in the bank at the end of this last calendar year. We have guided the street that we have plenty of money to go through the approval process and that we will be opportunistic in raising money for the commercialization effort. ... Again, our position is we have adequate money to take us through the approval process through April 17th, and we will raise capital at some time."

26.     After Wilson and other executives' statements touting the companies' financial position and the favorable prospect of Qsymia's expected launch later in the year, and in reliance on these statements, Plaintiffs made their first investment in Vivus on February 27, 2012, purchasing 100,000 shares for a total investment of $2,425,008. On that day, Vivus stock traded at a high of $25.14 per share, before closing at $23.78 per share.

7

Complaint for Violations of the Federal Securities Laws

27.     However, while Wilson and others touted the stock in public, behind the scenes they were selling their shares. On February 27, 2012, the day of his interview, Wilson sold 50,000 shares of Vivus stock at an average price of $25 per share, and Guy Marsh, VP of Operations and General Manager, sold 47,078 shares at an average price of $22.93 per share. Indeed, during the prior week, Wilson and Morris exercised options and sold 429,358 shares of Vivus stock after the FDA Advisory Committee recommended approval of Qnexa to the FDA.

28.     The day after Wilson judiciously claimed Vivus had $145 million in the bank but would nonetheless be "opportunistic" in raising money, Vivus announced a public offering of 8.5 million shares of common stock. Based on this surprise revelation, the stock price tumbled $2.52 to close at $21.26 per share, a decrease of 11% since Wilson's interview. The stock fell another 3% after hours on the news.

29.     In the prospectus Vivus released on February 29, 2012 for its public offering, Vivus stated that it intended to use the net proceeds from the offering:

> (i) to fund the creation of the infrastructure including the hiring of a field sales force and the development and production of promotional materials necessary to commercialize Qnexa in the United States, if approved, for the treatment of obesity; (ii) to cover expenses in connection with pursuing non-U.S. marketing approvals for Qnexa and avanafil; (iii) to fund new clinical trials for Qnexa and other product candidates; (iv) to finance our marketing and awareness efforts for Qnexa; (v) to fund the ongoing hiring of additional sales and marketing, regulatory, medical affairs and research and development and other personnel to support Qnexa and our other product candidates; (vi) to fund additional investment in information technology infrastructure and product support systems; (vii) for third-party contract supply costs; (viii) to fund the cost of any post-approval Qnexa requirements, including the cost to complete a cardiovascular outcomes study and any additional studies required for Qnexa; and (ix) for general corporate purposes, including working capital.

30.     Wilson, as both a director and the CEO of the company, knew or should have known that his statement about Vivus having "adequate money to take us [Vivus] through the approval process through April 17th" was false or misleading, given that within the next 48 hours the company would be filing a statement with the SEC that it would be selling 8.5 million shares "to fund the creation of the infrastructure…necessary to commercialize Qnexa in the United States…."

31.     Ultimately Plaintiffs were diluted 9 million shares, a half million more shares than originally announced.

Complaint for Violations of the Federal Securities Laws

32.     On July 18, 2012, defendant Tam was again pumping Vivus stock, this time on three television networks: Bloomberg TV, CNBC, and Fox Business. On Bloomberg TV Tam made the following statements:

a.   When asked how Qsymia works, Tam stated: "The drug is comprised of two active agents that has, the have, been approved by FDA. There is [sic] extensive patient years of experience on these two medications and we are using a proprietary formulation."

b.   When asked about the patent going out 2020 and analyst concern that eight years might not be long enough, Tam stated: "Well the patent, those are the patent laws, goes out to 2020. The company, Vivus, has a strategy to extend the patent life and then there are certainly strategies in place that could potentially increase the patent termination term for the product."

c.   When asked about analyst projections for Vivus's revenue of $1.2 billion in revenue out to 2016, or $300 million a year versus then current Vivus revenue of $50 million a year, and whether Tam was "comfortable with those types of numbers," Tam stated that: "We certainly see potential to be much larger than that, you know, if you think about the number of patients who are in need of this therapy. Clearly we are talking about 108 million adult Americans that could potentially use the treatment. And the fact that because this treatment is so effective, we certainly believe that the revenue projection could be substantially higher than that."

33.     Tam knew or should have known his statements on Bloomberg TV on July 18, 2012, were false or misleading to the public given that:

a.   Vivus had non-public communications with the FDA and CHMP regarding the need for additional cardiovascular studies, particularly since one of the two medications contained in Qsymia was in the drug Phen Fen that was pulled from the market for cardiovascular issues;

b.   The Vivus patent was vulnerable to a patent challenge given the existence of an earlier filed patent and other problems with the patent; and

c.   Vivus had non-public communications with the FDA regarding the potential REMS for the Qsymia and the potential REMS limitations would severely restrict Vivus's opportunity to monetize Qsymia by restricting its sales to only mail order pharmacies. Such a restriction in the

Complaint for Violations of the Federal Securities Laws

early part of Qsymia's lifespan on the market would largely doom the drug's chances for large scale success given the critical nature of the first six months of a drug's being on the market.

34.    On July 18, 2012, Tam appeared on CNBC to pump Vivus's stock:

a.    The host asked Tam: "What we always ask, Peter, is the side-effect profile. This, do you need to be careful when you use an obesity drug, still at this point?" Tam responded: "Yeah, I think it's actually very important for patients to use the drug properly, and for physicians to educate patients in terms of how to use the medication. Keep in mind that both of these drugs that are in Qsymia are drugs that have been approved by FDA and have been used by millions and millions of patients at much much higher doses. Qsymia is actually a combination of low doses of two drugs that have been used. So we are very very comfortable with the safety profile of Qsymia."

b.    Tam was later asked by the host: "What will the label list as, in terms of precautions and side effects? Any, anything, any heart related red flags? Anything like that, we just, just from worries in the past about obesity drugs? And the, you know, the saga of almost any obesity drug, there always seems to be something you need to worry about? Tam stated in response: "Yes, it is important for patients who are pregnant to not use Qsymia. Ah, this is an absolute contraindication. So that's an important consideration. Ah, some of the common side effects associated with Qsymia are dry mouth, constipation. So these are side effects that are, ah, mild in nature. Ah, again patients with Qsymia can actually down titrate, if that's necessary."

35.    Tam knew or should have known his statements on CNBC on July 18, 2012, were false or misleading to the public given that Vivus had non-public communications with the FDA and CHMP regarding the need for additional cardiovascular studies. This is particularly true since Qsymia elevated some patient's heart rates by 1.6 beats per minute and one of the two medications contained in Qsymia was in the drug Phen Fen that was pulled from the market for cardiovascular issues.

36.    On July 18, 2012, Tam also appeared on Fox Business to tout the company. Among other statements, Tam stated:

a.    When asked whether the drug would be a blockbuster drug, totaling more than $1 billion in sales, Tam responded: "Yeah, well when you think about 108 million American adults who

Complaint for Violations of the Federal Securities Laws

1    are overweight or obese that could potentially be patients for this therapy. Certainly we are

2    talking about very very significant product sales potential."

3         37.    Tam knew or should have known his statements on Fox Business on July 18, 2012, were

4    false or misleading to the public given that:

5              a.    Vivus had non-public communications with the FDA regarding the potential REMS for

6    the Qsymia and the potential REMS limitations would severely restrict Vivus's opportunity to

7    monetize Qsymia by restricting its sales to only mail order pharmacies. Such a restriction in the

8    early part of Qsymia's lifespan on the market would largely doom the drug's chances for large

9    scale success given the critical nature of the first six months of a drug's being on the market.

10        38.    On that same day, July 18, 2012, Individual Defendants and Vivus insiders sold off Vivus

11   stock:

12             a.    Defendant Wilson exercised 100,000 options to purchase common stock and sold those

13   same shares at the near historical high of $30.36 per share for net proceeds of $3,036,000. This

14   one-day sale represented 46% of Wilson's remaining Vivus stock.

15             b.    Defendant Morris exercised his remaining 25,000 options to purchase common stock and

16   sold those same shares at the near historical high of $30.36 per share for net proceeds of

17   $759,000. This one-day sale represented 100% of Morris's remaining Vivus stock.

18             c.    Defendant Tam exercised 25,000 options to purchase common stock and sold those same

19   shares at the near historical high of $30.95 per share for net proceeds of $773,750. This one-day

20   sale represented 40% of Tam's remaining Vivus stock.

21             d.    Guy P Marsh, VP of Operations and General Manager, exercised 36,191 options to

22   purchase common stock and sold those same shares at the near historical high of $30.36 per

23   share for net proceeds of $1,098,759. This one-day sale represented 95% of Marsh's remaining

24   Vivus stock.

25             e.    Wesley Day, VP of Clinical Research, exercised 16,800 options to purchase common

26   stock and sold those same shares at the near historical high of $30.36 per share for net proceeds

27   of $510,048. This one-day sale represented 95% of Day's remaining Vivus stock.

28

Complaint for Violations of the Federal Securities Laws

f.   Michael P Miller, Chief Commercial Officer, exercised 25,000 options to purchase common stock and sold those same shares at the near historical high of $30.36 per share for net proceeds of $759,000. This one-day sale represented 76% of Miller's remaining Vivus stock.

g.   John L Slebir, Legal Counsel and VP of Business Development, exercised 10,000 options to purchase common stock and sold those same shares at the near historical high of $30.36 per share for net proceeds of $303,600. This one-day sale represented 71% of Slebir's remaining Vivus stock.

39.   The Individual Defendants took advantage of their own fraudulent misrepresentations and omissions, which resulted in temporarily inflated Vivus share values, to exercise their own stock options and immediately sell off the majority of their shares during the near historic highs in a classic "pump and dump."

40.   From July 18, 2012, the day of Peter Tam's interviews, to August 1, 2012, Vivus's stock price fell from a high of $31 per share to just under $20 per share, which amounted to a 35% decrease in its price. By the end of August, 2012, the Individual Defendants and other Vivus officers and directors had sold off the majority of their Vivus stock.

41.   The following charts set out the Individual Defendants' sales of shares from 2010 to 2012:

| Date | Shares Acquired (Disposed) | Transaction Type | Price per Share | Proceeds |
|---|---|---|---|---|
| **Defendant Wilson's Non Derivative Securities Transactions 2010-2012** | | | | |
| **2010** | | | | |
| 1/15/2010 | 70,000 | Option Exercise | $4.8439 | $(339,073.00) |
| 1/15/2010 | (49,450) | Sale | $9.34 | $461,863.00 |
| 5/18/2010 | (50,000) | Sale | $13.00 | $650,000.00 |
| 12/15/2010 | 10,000 | Option Exercise | $3.875 | $(38,750.00) |
| 12/15/2010 | (62,000) | Sale | $9.1638 | $568,155.60 |
| Net Gain from Option Exercises and Stock Sales | | | | $1,302,195.60 |
| **2011** | | | | |
| **2012** | | | | |
| 2/23/2012 | 72,875 | Option Exercise | $4.00 | $(291,500.00) |
| 2/23/2012 | (72,875) | Sale | $20.69 | $1,507,783.75 |
| 2/23/2012 | 77,125 | Option Exercise | $4.58 | $(353,232.50) |
| 2/23/2012 | (77,125) | Sale | $20.69 | $1,595,716.25 |
| 2/27/2012 | 22,875 | Option Exercise | $4.00 | $(91,500.00) |

Complaint for Violations of the Federal Securities Laws

| 2/27/2012 | (22,875) | Sale | $25.00 | $571,875.00 |
|---|---|---|---|---|
| 2/27/2012 | 5,027 | Option Exercise | $4.58 | $(23,023.66) |
| 2/27/2012 | (5,027) | Sale | $25.00 | $125,675.00 |
| 2/27/2012 | 22,098 | Option Exercise | $4.58 | $(101,208.84) |
| 2/27/2012 | (22,098) | Sale | $25.00 | $552,450.00 |
| 6/11/2012 | 23,880 | Option Exercise | $4.15 | $(99,102.00) |
| 6/11/2012 | (23,880) | Sale | $25.18 | $601,298.40 |
| 6/11/2012 | 26,120 | Option Exercise | $ 4.15 | $(108,398.00) |
| 6/11/2012 | (26,120) | Sale | $25.18 | $657,701.60 |
| 6/27/2012 | 50,000 | Option Exercise | $4.15 | $(207,500.00) |
| 6/27/2012 | (50,000) | Sale | $28.00 | $1,400,000.00 |
| 7/18/2012 | 50,315 | Option Exercise | $2.95 | $(148,429.25) |
| 7/18/2012 | (50,315) | Sale | $30.36 | $1,527,563.40 |
| 7/18/2012 | 29,003 | Option Exercise | $3.73 | $(108,181.19) |
| 7/18/2012 | (29,003) | Sale | $30.36 | $880,531.08 |
| 7/18/2012 | 20,682 | Option Exercise | $3.73 | $(77,143.86) |
| 7/18/2012 | (20,682) | Sale | $30.36 | $627,905.52 |
| Net Gain from Option Exercises and Stock Sales | | | | $8,439,280.70 |

| Defendant Tam's Non Derivative Securities Transactions 2010-2012 | | | | |
|---|---|---|---|---|
| **Date** | **Shares Acquired (Disposed)** | **Transaction Type** | **Price per Share** | **Proceeds** |
| **2010** | | | | |
| 1/18/2010 | 8,750 | Option Exercise | $4.8439 | $(42,384.13) |
| 12/16/2010 | 18,750 | Option Exercise | $3.8750 | $(72,656.25) |
| 12/16/2010 | (10,000) | Sale | $9.2807 | $92,807.00 |
| Net Gain from Option Exercises and Stock Sales | | | | $(22,233.38) |
| **2011** | | | | |
| 7/11/2011 | 5,000 | Option Exercise | $3.40 | $(17,000.00) |
| Net Gain from Option Exercises and Stock Sales | | | | $(17,000.00) |
| **2012** | | | | |
| 1/10/2012 | (12,386) | Sale | $12.00 | $148,632.00 |
| 1/11/2012 | (27,014) | Sale | $12.00 | $324,168.00 |
| 6/14/2012 | (60,000) | Sale | $25.25 | $1,515,000.00 |
| 6/14/2012 | 21,250 | Option Exercise | $3.49 | $(74,162.50) |
| 6/14/2012 | (21,250) | Sale | $25.2848 | $537,302.00 |
| 6/14/2012 | 8,750 | Option Exercise | $3.49 | $(30,537.50) |
| 6/14/2012 | (8,750) | Sale | $25.2848 | $221,242.00 |
| 6/14/2012 | 17,647 | Option Exercise | $4.00 | $(70,588.00) |
| 6/14/2012 | (17,647) | Sale | $25.2848 | $446,200.87 |

Complaint for Violations of the Federal Securities Laws

| 6/14/2012 | 8,783 | Option Exercise | $4.00 | $(35,132.00) |
| 6/14/2012 | (8,783) | Sale | $25.2848 | $222,076.40 |
| 6/14/2012 | 20,026 | Option Exercise | $4.58 | $(91,719.08) |
| 6/14/2012 | (20,026) | Sale | $25.2848 | $506,353.40 |
| 6/14/2012 | 14,974 | Option Exercise | $4.58 | $(68,580.92) |
| 6/14/2012 | (14,974) | Sale | $25.2848 | $378,614.60 |
| 6/14/2012 | 15,822 | Option Exercise | $4.53 | $(71,673.66) |
| 6/14/2012 | (15,822) | Sale | $25.2848 | $400,056.11 |
| 6/14/2012 | 19,178 | Option Exercise | $4.53 | $(86,876.34) |
| 6/14/2012 | (19,178) | Sale | $25.2848 | $484,911.89 |
| 6/14/2012 | 13,841 | Option Exercise | $4.15 | $(57,440.15) |
| 6/14/2012 | (13,841) | Sale | $25.2848 | $349,966.92 |
| 6/14/2012 | 21,159 | Option Exercise | $4.15 | $(87,809.85) |
| 6/14/2012 | (21,159) | Sale | $25.2848 | $535,001.08 |
| 6/14/2012 | 20,000 | Option Exercise | $3.73 | $(74,600.00) |
| 6/14/2012 | (20,000) | Sale | $25.2848 | $505,696.00 |
| 6/14/2012 | 4,102 | Option Exercise | $3.73 | $(15,300.46) |
| 6/14/2012 | (4,102) | Sale | $25.2848 | $103,718.25 |
| 6/14/2012 | 15,898 | Option Exercise | $3.73 | $(59,299.54) |
| 6/14/2012 | (15,898) | Sale | $25.2848 | $401,977.75 |
| 6/14/2012 | 9,480 | Option Exercise | $3.13 | $(29,672.40) |
| 6/14/2012 | (9,480) | Sale | $25.2848 | $239,699.90 |
| 6/14/2012 | 25,520 | Option Exercise | $3.13 | $(79,877.60) |
| 6/14/2012 | (25,520) | Sale | $25.2848 | $645,268.10 |
| 6/18/2012 | 20,000 | Option Exercise | $3.73 | $(74,600.00) |
| 6/18/2012 | (20,000) | Sale | $26.45 | $529,000.00 |
| 6/19/2012 | 20,000 | Option Exercise | $3.73 | $(74,600.00) |
| 6/19/2012 | (20,000) | Sale | $27.25 | $545,000.00 |
| 7/18/2012 | 25,000 | Option Exercise | $4.25 | $(106,250.00) |
| 7/18/2012 | (25,000) | Sale | $30.95 | $773,750.00 |
| Net Gain from Option Exercises and Stock Sales | | | | $8,624,915.26 |

| **Defendant Morris' Non Derivative Securities Transactions 2010-2012** | | | | |
|---|---|---|---|---|
| **Date** | **Shares Acquired (Disposed)** | **Transaction Type** | **Price per Share** | **Proceeds** |
| **2010** | | | | |
| 6/14/2010 | 26,250 | Option Exercise | $3.13 | $(82,162.50) |
| 6/14/2010 | (26,250) | Sale | $12.16 | $319,289.25 |
| Net Gain from Option Exercises and Stock Sales | | | | $237,126.75 |

14

Complaint for Violations of the Federal Securities Laws

| 2011 | | | | |
| --- | --- | --- | --- | --- |
| **2012** | | | | |
| 2/23/2012 | 4,267 | Option Exercise | $4.15 | $(17,708.05) |
| 2/23/2012 | (4,267) | Sale | $20.69 | $88,284.23 |
| 2/23/2012 | 91 | Option Exercise | $ 4.15 | $(377.65) |
| 2/23/2012 | (91) | Sale | $20.69 | $1,882.79 |
| 2/23/2012 | 56,183 | Option Exercise | $4.25 | $(238,777.75) |
| 2/23/2012 | (56,183) | Sale | $20.69 | $1,162,426.27 |
| 2/23/2012 | 43,817 | Option Exercise | $4.25 | $(186,222.25) |
| 2/23/2012 | (43,817) | Sale | $20.69 | $906,573.73 |
| 2/23/2012 | 25,000 | Option Exercise | $5.67 | $(141,750.00) |
| 2/23/2012 | (25,000) | Sale | $20.90 | $522,500.00 |
| 2/23/2012 | 125,000 | Option Exercise | $5.67 | $(708,750.00) |
| 2/23/2012 | (125,000) | Sale | $20.69 | $2,586,250.00 |
| 2/24/2012 | 25,000 | Option Exercise | $5.67 | $(141,750.00) |
| 2/24/2012 | (25,000) | Sale | $21.55 | $538,750.00 |
| 2/27/2012 | 20,544 | Option Exercise | $5.67 | $(116,484.48) |
| 2/27/2012 | (20,544) | Sale | $22.93 | $471,073.92 |
| 2/27/2012 | 4,456 | Option Exercise | $5.67 | $(25,265.52) |
| 2/27/2012 | (4,456) | Sale | $22.93 | $102,176.08 |
| 2/27/2012 | 25,000 | Option Exercise | $4.23 | $(105,750.00) |
| 2/27/2012 | (25,000) | Sale | $24.90 | $622,500.00 |
| 7/18/2012 | 25,000 | Option Exercise | $4.23 | $(105,750.00) |
| 7/18/2012 | (25,000) | Sale | $30.36 | $759,000.00 |
| Net Gain from Option Exercises and Stock Sales | | | | $5,972,831.32 |

42.    As the foregoing charts demonstrated, the Individual Defendants' heavy trading activity around February and June 2012 was anomalous compared to the two prior years.

43.    However, while the Individual Defendants were selling their shares, Plaintiffs were buying shares in reliance on Vivus and the Individual Defendants' public statements.

### III.    Vivus Failed to Disclose Negative Facts Surrounding Its Qsymia Patent

44.    The two drugs that compose Qsymia are phentermine and topiramate. Johnson & Johnson holds a patent on topiramate, an ingredient in Qsymia, for the treatment of obesity (the "Shank Patent"), which was originally filed as a provisional patent application on June 29, 1996. Dr. Thomas Najarian, provisionally filed as sole inventor for Qsymia's two-drug composition for treatment of obesity on June 14, 1999 (the "Najarian Patent"). Prior to Dr. Najarian's provisional filing, there was an earlier filed

Complaint for Violations of the Federal Securities Laws

patent by Dr. Susan McElroy on February 24, 1999 for the same or similar combination of phentermine and topiramate for the treatment of obesity.

45.     On November 8, 2011, Vivus filed its Form 10-Q with the SEC. On February 28, 2012, Vivus filed its Form 10-K with the SEC for the fiscal year ended December 31, 2011. In those forms, Vivus discussed a patent issue involving the Qsymia drug, which seemingly resolved any issues of infringement:

> On October 16, 2001, the Company entered into an assignment agreement, or the Assignment Agreement, with Thomas Najarian, M.D. for a combination of pharmaceutical agents for the treatment of obesity and other disorders, or the Combination Therapy, that has since been the focus of our investigational drug candidate development program for Qnexa for the treatment of obesity, obstructive sleep apnea and diabetes. The Combination Therapy and all related patent applications, or the Patents, were transferred to the Company with worldwide rights to develop and commercialize the Combination Therapy and exploit the Patents.

46.     The Form 10-K further reaffirmed the solidity of the Qnexa patent, stating: "We believe we have strong intellectual property supporting several opportunities in obesity and related disorders, such as sleep apnea and diabetes, and men's sexual health."

47.     Pursuant to the requirements of the Securities Exchange Act of 1934, the November 8, 2011 Form 10-Q was signed by Wilson and Morris.

48.     Pursuant to the requirements of the Securities Exchange Act of 1934, the February 28, 2012 Form 10-K was signed by Wilson, Tam, and Morris, among other Vivus officers.

49.     When defendant Wilson signed the October 16, 2001 agreement on behalf of Vivus, Vivus was aware of the McElroy patent because it specifically included a condition that made future milestone payments contingent on certain events relating to the McElroy Patent that would reduce or eliminate the risk of freedom-to-operate or infringement challenges to Vivus's use of the Najarian Patent.

50.     Throughout the summer of 2012, a number of analyst reports and articles were published that discussed Vivus's patent problems and the Company's failure to address all of them. The first report was  published by Citron on July 19, 2012, which stated that:

> A condition was introduced to the assignment agreement between Vivus and Dr. Najarian that made future milestone payments contingent on the Najarian patents prevailing over another, earlier-filed third-party patent by inventor McElroy. The company found the McElroy patent important enough to make it a condition in the licensing agreement with Najarian… This is a second threat to Vivus's freedom-to-operate and, it is referenced explicitly in the assignment

16

Complaint for Violations of the Federal Securities Laws

agreement from Dr. Najarian on October 16, 2001... In fact, payments to Dr. Najarian are explicitly made contingent on "freedom to operate" with relation to the McElroy patent... The Najarian patent has a huge problem with regard to dates. Simply, the McElroy patent's provisional filing was earlier – Feb 24, 1999 – than the Najarian patent, which was June 14, 1999....

51.     Citron's ultimate position was that it was "astounded by the weakness of Vivus's intellectual property protection." In addition to the potential freedom to operate challenges, the Citron report also raised a number of other concerns about the intellectual property underlying Qsymia. The report raised the concern that the Shank patent was enforceable until 2017 and that Vivus had not fully disclosed the risk to the company, nor its plan to address the potential Shank patent infringement issue. Citron also raised prior art and obviousness issues, which could undercut Vivus's patent application defense, as well as whether Dr. Najarian actually had the right to assign Vivus's key patent.

52.     Vivus's stock price tumbled from its closing price of $29.00 on July 18, 2012 to its closing price of $25.78 on July 19, 2012, an 11% drop. This was due to the Citron report's revelations of the freedom-to-operate issues and other patent issues of the Qsymia drug. The true scope and nature of the patent issues, including the McElroy patent information, were not made publically available in any of Vivus's SEC filings.

53.     In a July 23, 2012 conversation with defendant Morris, Vivus's CFO, plaintiff Thomas Jasin asked if any of the concerns expressed in recent reports about Qsymia patents were true. Morris said unequivocally that the reports were bogus and assured him the patents were rock solid. Based on these assurances, Plaintiffs purchased in excess of 38,000 shares of Vivus stock between July 25, 2012 and August 17, 2012.

54.     In its filings with the SEC and in conversations with Plaintiffs, Vivus made material misrepresentations and omissions about the risks of patent infringement and other patent-related liabilities in its public disclosure statements. Specifically, Vivus failed to adequately disclose the risks from the Shank Patent and McElroy Patent which could, at the least, expose Vivus to a legal challenge and potentially prevent sales of Qysmia.

Complaint for Violations of the Federal Securities Laws

55.     Vivus's misrepresentations and failure to disclose this material information harmed Plaintiffs directly because they purchased shares and options without knowing crucial information about Vivus's patent infringement issues, which would negatively affect Vivus's stock price in the future.

**IV.     Vivus Failed to Disclose that the EMA Was Unlikely to Approve Qsymia For Sale in Europe**

56.     Throughout 2011 and in early 2012, Vivus spoke optimistically about Qsymia's potential approval in Europe. The Committee for Medicinal Products for Human Use (CHMP) is the committee at the EMA responsible for preparing opinions on questions concerning medicines for human use. The members and alternates of the CHMP are nominated by European Union Member States in consultation with the Agency's Management Board, and chosen based on the strength of their qualifications and expertise with regard to the evaluation of medicines. One of the Rapporteurs for Vivus's submission was appointed by France. Rapporteurs are voting members of the CHMP and carry a strong voice in leading the voting process.

57.     After submitting its application in Europe in late 2010 and having follow-up communications with the CHMP, Vivus reported in its November 11, 2011 3rd Quarter Earnings conference call that: "In Europe we held a productive clarification meeting with our Rapporteur and Co-rapporteur in September. Our response to the 120-day questions from the CHMP is nearly complete. We are on track to file a response in the fourth quarter of this year. We anticipate the CHMP will issue their 180-day opinion in the first quarter of 2012."

58.     Besides this brief, cursory statement, Vivus provided no additional information regarding any potential issues raised by the CHMP, and failed to disclose any information that would raise a red flag regarding the potential for approval.

59.     In its 10-Q filed November 8, 2011 and in its 10-K filed February 28, 2012 for 2011, Vivus reported further that: "On December 17, 2010, we filed a Marketing Authorization Application, or MAA, with the European Medicines Agency, or EMA, for Qnexa Controlled-Release Capsules in the European Union, or EU."

60.     The 10-Q went on to say that "[t]he proposed indication in the EU is for the treatment of obesity, including weight loss and maintenance of weight loss, and should be used in conjunction with a

Complaint for Violations of the Federal Securities Laws

mildly hypocaloric diet. The EMA's review of Qnexa will follow their centralized marketing authorization procedure. If approved, Qnexa could receive marketing authorization in all 27 EU member countries. The MAA was officially validated for central procedure on January 19, 2011. If approved in the EU, Qnexa could be recommended for obese adult patients (BMI >= 30 kg/m2), or overweight patients (BMI >= 27 kg/m2) with weight-related co-morbidities such as hypertension, type 2 diabetes, dyslipidemia, or central adiposity (abdominal obesity). In Europe, approximately 150 million adults are considered overweight or obese, and the prevalence is rising rapidly."

61.    Vivus further stated in its 10-K that: "In May 2011, we received a response to our MAA from the CHMP. The response was in the form of the '120-day questions.' The 120-day questions covered a broad range of topics including, without limitation, issues relating to phentermine, which include historical concerns regarding its potential association with valvulopathy and pulmonary hypertension; heart rate and limited long-term safety data in high-risk patients; and known and suspected effects of topiramate which include CNS and teratogenic potential. ... The 120-day questions were consistent with the issues previously raised in the FDA review process. We met with representatives from the CHMP in September 2011 to seek clarification on certain questions. We submitted our response to the 120-day questions in the fourth quarter of 2011. In January 2012, we received the 180-day List of Outstanding Issues, or 180-day LOI, from the CHMP. ... The 180-day LOI contained requests for additional information including risk minimization activities to address various issues relating to cardiovascular, neuropsychiatric and potential teratogenic effects of Qnexa. In addition, we were asked to discuss the benefit/risk of the different doses of Qnexa, its potential use in different patient populations, and the expected long-term benefit of treatment with Qnexa. We are preparing our response, which we plan to submit in the second quarter of 2012. There can be no assurance that our response will be adequate or that our MAA will be approved by the CHMP."

62.    Again, Vivus raised no specific red flags about approval in Europe.

63.    Before Plaintiffs made their investment on February 27, 2012, plaintiff Thomas Jasin contacted defendant Morris and asked him to elaborate on Vivus's statement that CHMP and FDA questions were consistent. Plaintiff Thomas Jasin asked defendant Morris whether Vivus needed to do

anything different for European approval. Defendant Morris responded that the CHMP did not ask Vivus to provide any more information than what Vivus had available for the FDA.

64.   Defendant Morris raised no specific red flags about approval in Europe.

65.   In the prospectus Vivus released on February 29, 2012 for its public offering, Vivus provided a generic statement that it intended to use the net proceeds from the offering, at least in part, to "(viii) to fund the cost of any post-approval Qnexa requirements, including the cost to complete a cardiovascular outcomes study and any additional studies required for Qnexa." No specifics were provided about the type or cost of such a study, or what governing body would require the study.

66.   Not knowing of any issues with Qsymia's approval in Europe, Plaintiffs further invested in Vivus in reliance on Vivus's and the Individual Defendants' statements.

67.   In July 23, 2012, plaintiff Thomas Jasin again contacted Vivus's Morris. In the telephone conversation with defendant Morris, Jasin asked about the status of its European marketing authorization request. He was told that there was nothing new to report, because nothing negative, positive, or unusual had happened, but that it was "looking real good for approval." Based on Vivus's statements above, coupled with plaintiff Thomas Jasin's conversation with Morris, Vivus's CFO, Plaintiffs purchased over 192,000 shares of stock between April 20, 2012 and July 30, 2012. This included a purchase of 13,067 shares on July 30, 2012.

68.   On September 21, 2012, Vivus's stock closed at $21.00 (down 11.5% from the previous close of $23.72) after the Company announced that approval of Qsymia in Europe was unlikely. On September 24, 2012, plaintiff Thomas Jasin emailed Morris to ask whether the European regulators had explicitly stated that Qsymia would not be approved, or whether it had merely been implied. Morris responded to plaintiff Thomas Jasin by email that it was Vivus's "general impression" based on recent meetings. Nonetheless, on October 18, 2012, the stock fell again when the European CHMP officially notified Vivus of its decision to not recommend the sale of Qsymia in Europe. Overall, throughout the period of September 21, 2012 to October 18, 2012, Plaintiffs purchased 138,700 shares of Vivus stock. Vivus stock price also fell 7% during this time, largely due to the European revelations.

69.   The following year in 2013, plaintiff Thomas Jasin had a telephone conversation with a EMA Official who alerted plaintiff Thomas Jasin for the first time that Vivus was asked in 2011 by the

Complaint for Violations of the Federal Securities Laws

1  CHMP to conduct a pre-approval cardiovascular study, and that Vivus was informed Qsymia would not

2  be recommended for approval until after completion of a successful cardiovascular outcome study.

3  Vivus was told outright in 2011 that France's voting representative was going to object to approval and

4  to make its case to all member representatives unless Vivus conducted pre-approval cardiovascular

5  studies.

6       70.    Vivus misrepresented and failed to disclose material information regarding the likelihood

7  of success of their European application. Vivus failed to disclose this key information it learned in 2011

8  surrounding the dire prospects for approval in Europe. Vivus failed to disclose to Plaintiffs and other

9  shareholders negative information it received via conversations with the French rapporteur and other

10  CHMP members.

11       71.    Vivus's misrepresentations and failure to disclose material information harmed Plaintiffs

12  directly because they purchased shares at inflated prices based on and in reliance of Vivus's

13  misinformation and material non-disclosures. Plaintiffs would not have purchased Vivus shares during

14  this period if the true facts were known about Qsymia's bleak prospects in Europe. Specifically:

15       a.  The statements in Vivus's 10-Q filed on November 8, 2011, and the 10-K filed on

16  February 28, 2012, pertaining to the 120-day questions were false and misleading to the extent

17  they suggested the issues raised by the CHMP were consistent with issues previously raised in

18  the FDA review process. Vivus was expressly informed by the CHMP that a cardiovascular

19  study would be required prior to approval, which was evidently not a precondition of the FDA

20  review process and approval. Morris' statement to plaintiff Thomas Jasin prior to Plaintiffs'

21  February 27, 2012 stock purchase was false and misleading for the same reason.

22       b.  The July 2012 conversation with Morris contained false and misleading statements, as it

23  continued the ongoing fraud. Morris did not disclose that it was clearly stated at the September

24  2011 meeting with the CHMP that a preapproval study was necessary.

25       c.  The September 24, 2012 email to plaintiff Thomas Jasin from Morris was false and

26  misleading to the extent Morris only stated it was Morris' "general impression" that Qsymia

27  would be denied, despite prior information from the CHMP making Qsymia's denial a near

28  certainty without a cardiovascular study.

Complaint for Violations of the Federal Securities Laws

### III.   Vivus Failed to Disclose that It Did Not Enlist Sufficient Pharmacies to Sell Qsymia at the Drug's Launch, Thus Dooming the Launch

72.   Once it became clear that approval in Europe was unlikely to occur, Qsymia's launch in the United States planned for late September of 2012 took center stage. As stated in an email to plaintiff Thomas Jasin from September 25, 2012 "EU news zero impact on patients or doctors." Thus, even after the disappointment caused by the announcement regarding the failure to gain European approval, Vivus downplayed the import of these revelations and optimistically described its prospects for a successful launch.

73.   On February 22, 2012, after the FDA announcement, defendants Wilson and Tam, and Vivus officers Michael Miller (Chief Commercial Officer) and Barbra Troupin, (Vice President of Scientific Communications and Risk Management) attended an analyst conference call. In response to an analyst question as to whether the Company could launch the product on its own, Wilson misleadingly stated that Vivus was "ready to spring into action" to successfully launch Qysmia. Wilson, Tam and the other Vivus officers also failed to disclose that certain states would not allow doctors to prescribe Qsymia through the mail, and that relying on mail order pharmacies would not produce the level of revenues which the market was predicting. Wilson, Tam and the other Vivus officers failed to disclose that Qysmia's launch was going to be "controlled" and not a full launch.

74.   Wilson, as a Vivus director and Chief Executive Officer of the Company since 1997, knew or should have known how crucial the first six months of a pharmaceutical launch is for the success of a drug, especially for a drug that only had eight years of patent protection remaining. Additionally, Wilson knew or should have known that the market understood the importance of the first six months of a pharmaceutical launch and that his reassurance of the company being "ready to spring into action" in response to a direct question on the company's readiness, when the company was anything but ready, would mislead the market as to the potential success of Qysmia.

75.   Prior to the Plaintiffs' February 27, 2012, stock purchase, plaintiff Thomas Jasin asked Vivus CFO Tim Morris to help him understand how Vivus would maximize Qsymia sales and profits as described in its SEC reports. In the course of that discussion Morris told him that the company was in negotiations with and has suitors from big pharmaceutical companies to maximize sales through various

forms of partnerships, however, to gain the best negotiation position and partnership deal, Vivus informed these suitors in its discussions that Vivus is prepared and capable of launching Qsymia themselves because of its expert knowledge of the obesity market. Morris indicated this tactic would result in an advantageous partnership and marketing agreement at launch to within a few months after launch.

76.     Morris, as Vivus's Chief Financial Officer and Senior Vice President of Finance and Global Corporate Development, knew or should have known how crucial the first six months of a pharmaceutical launch is for the success of a drug and seeking a partnership and marketing agreement after the launch of the drug would make it nearly certain that Qsymia would be a failure.

77.     On February 27, 2012, Leland Wilson, Vivus's Chief Executive Officer, was interviewed on CNBC on the Fast Money Halftime Show and appeared optimistic about the Company's prospects for a do-it-yourself launch. Following up on the theme sounded to plaintiff Thomas Jasin, on the air, Wilson stated that after approval, the Company was going to launch the drug themselves in the United States. "In the United States we're going to launch this product on our own. We believe we have the best understanding of this drug and how to best position this product for its long-term success. We've assembled a marketing team and feel confident we can launch the product."

78.     Wilson knew or should have known that his statement about Vivus having "adequate money to take us [Vivus] through the approval process through April 17th" was false or misleading given that within the next 48 hours the company would be filing a statement with the SEC that it would sell 8.5 million shares "to fund the creation of the infrastructure…necessary to commercialize Qnexa in the United States…."

79.     The launch was necessarily comprised of two parts: Educating doctors so that they could write prescriptions for the drug, and procuring pharmacies to sell the drug so that patients could purchase it once prescribed. At the Needham Healthcare Conference on April 4, 2012, Morris made clear that Vivus's plan was to market to doctors treating target patients and allow the patients to get the drug through mail order pharmacies.

80.     According to Morris, their plan was well underway. "From a sales and marketing standpoint … The initial target audience is about 25,000 doctors, that's consisting of about 16,000

23

doctors that are writing a bulk of the prescriptions for obesity drugs, predominantly, phentermine right now. On top of that, you get about another 9,000 doctors that are the high decile writers for the co-morbidities …. Our plan is to launch the product ourselves, again in the second half. We will - and are building a sales force consisting of about 150 reps and will look to expand that partnership. For the drug to be ultimately successful, you do need to reach the GPs [general practitioners]. But we're going to have a very responsible, a very controlled launch, and so we want to start with the base education of these 25,000 doctors, they understand how to use the product, the right patients to use it on, and they all have good experiences. Now beyond that, we'll do some type of a promotion or partnership, or what have you, to really increase the resource from a sales force standpoint, in really in year two, targeting kind of at the GP level."

81.     Further, he went on that "[w]e have a commercial team in place, Mike Miller's been with us for a couple of years, I think some of you folks have met him. He's recently hired as National Sales Director, Chris Thompson from Amgen. He's also hired his market access guy to help us work with all these pharmacies, his name is Al Tenuto, he comes to us from Lilly and ALZA prior to that. So - and Mike and Chris and Al are busy building out their team. We have said in the past that we will use a contract sales organization for the 150 reps or so. Those are fairly, I'll say, easy to do, although hiring 150 people is never that easy. But in any event, those are turnkey, the quality of the reps these days is very high. It's a very efficient way to go, you need about 8 to 10 weeks to get those guys from start to finish. So this is all in place and they've been busy, as you can imagine, working on preparing for the launch."

82.     Once these doctors were educated and started writing prescriptions, patients would supposedly be able to procure the drug through mail order pharmacies. At the Needham Health Care Conference, Morris stated that the Company was going to "use a home delivery system and … focus on probably the ten largest mail order pharmacies" [emphasis added]. The next month, at the Deutsche Bank Health Care Conference, Morris clarified that, at launch: "So we'll have - at launch we'll probably at least have half a dozen of these large mail-order pharmacies that are all in the certified Qnexa network". This was to be the only way for patients to get a prescription once prescribed by their doctors.

83.     In a July 2012 conversation with Morris, Vivus's CFO, plaintiff Thomas Jasin asked if the company currently had enough resources, considering limitations of the REMS [Risk Evaluation and Mitigation Strategies] restrictions, to profitably sell Qsymia without a domestic launch partner. Morris told him that "if there were concerns they would have been publicly announced - we are in good shape - we studied the issues, know what it will cost and have planned accordingly". On another subject, he asked Morris if they were planning a soft or full launch for Qsymia. Morris told him that Qsymia "will be a full launch" and reiterated what CEO Leland Wilson said in a February 2012 conference call that Vivus is "ready to spring into action."

84.     On August 7, 2012, Vivus filed a Form 10-Q indicating that it first entered it agreement with its rented sales force in May 22, 2012 and that it did not enter into a commercial manufacturing agreement for the production of Qsymia until July 17, 2012. Thus before May 22, 2012, Vivus had no sales force for selling Qsymia, nor any means to manufacture the drug for retail purposes.

85.     The August, 7, 2012, Form 10-Q also first disclosed the distribution of Qsymia by Cardinal Health and the home delivery pharmacies – specifically "a small number of home delivery pharmacies." The Form 10-Q also first disclosed the risks of such a distribution system, but did not fully disclose that Vivus was woefully short of meeting the expectations it had set in the market for the launch.

86.     In a September 2012 email and subsequent telephone conversation with plaintiff Thomas Jasin, Morris said "Qsymia will be/is a full launch." Both Morris and Wilson made misrepresentations because in fact, Qsymia was not a full launch, it was in fact a soft incremental launch.

87.     Accordingly, in spite of Morris's optimistic predictions, by the time the product was launched, Vivus had not procured enough pharmacies to enable patients to get the drug and had not gotten doctors excited enough to prescribe it. At the launch on September 18, 2012, Vivus had only enlisted two pharmacies. By October 8, 2012, they had added only one more. By March 26, 2013, the total was still up to just four pharmacies.

88.     Wilson, Tam, Morris and other Vivus representatives consistently misled investors with positive statements, in which Vivus gave every indication that there would be no problem with the launch and that it could handle a successful launch on its own.

Complaint for Violations of the Federal Securities Laws

89.     The Qsymia launch on September 18, 2012 was an unmitigated disaster. FierceBiotech, an industry publication, labeled the Qsymia launch one of the top ten biopharma DUDS. The day before the launch, on September 17, 2012, Vivus stock closed at $22.93 per share. It increased to $24.44 the day of the launch. However, based on the launch's failure, by September 26, 2012, Vivus's stock price had plunged to a trading low of $17.21 per share, which amounted to a 25% decrease during this time. Overall, Plaintiffs purchased 180,000 shares of Vivus during the launch period.

90.     On a November 6, 2012 earnings call, Michael Miller (Vivus's Chief Commercial Officer and Senior Vice President) explained that a sample from the Qsymia pharmacy database suggested that "30% of pending prescriptions are abandoned by patients due to the cash outlay. To address these issues, we continue to prioritize obtaining payer coverage and will deploy other tactical innovative programs to reduce out-of patient costs for the patient – out-of-pocket costs for the patient." Based on the prescription abandonment rate, Vivus clearly was not "ready to spring into action," prepared for a full launch, or even prepared to make the launch. Vivus's executives knew or should have known of the necessity of gaining payor support to launch a drug and should have made statements explaining, addressing, or accounting for its lack of crucial payor support.

91.     Reflecting the news of November 6, 2012, Vivus stock opened at $13.25, had a high of $13.69 but also had a low of $11.00 and a close of $11.82.

92.     By November 15, 2012, even CEO Wilson admitted that he and the company had made mistakes with the launch. Nonetheless, by this time the stock had already tanked to just over $10 per share, its lowest price since late 2011, and he and the rest of the Individual Defendants and many members of the Board of Directors were already on their way out.

93.     Defendant's failed launch of Qsymia cost the Company $1.9 billion in market capitalization, caused the ire of the Company's shareholders, and made the company into a takeover target.

## IV.     Aftermath – FMC Launches a Proxy Fight and Takes Control Of Vivus's Board

94.     On June 4, 2013, First Manhattan Co. ("FMC"), an owner-managed and operated investment advisory firm and also the beneficial holder of approximately 9.9 percent of the outstanding shares of Vivus, filed definitive proxy materials with the Securities and Exchange Commission

Complaint for Violations of the Federal Securities Laws

regarding the election of its independent director nominees. FMC was seeking to have its nine highly qualified nominees elected to Vivus's Board at the Company's 2013 Annual Meeting of Stockholders, which was scheduled for July 15, 2013. FMC's letter to stockholders highlighted its belief that the Company's shares were significantly undervalued. The battle against Vivus was led by FMC Senior Managing Director, Dr. Samuel F. Colin, M.D., who was also responsible for managing FMC healthcare investment funds.

95.     According to FMC at the time, "the current valuation does not reflect the enormous upside opportunity of Qsymia, the most effective obesity drug ever developed, because the current Vivus leadership has not delivered on Qsymia's promise. We believe the stock's current depressed level is a direct result of Vivus (i) failing to secure a U.S. commercial partnership, (ii) failing to properly plan and execute the Qsymia launch, (iii) failing to obtain European Qsymia approval, and (iv) perpetuating an entrenched Board culture that is not aligned with shareholder interests."

96.     In response, Vivus fought against FMC's proxy, and then offered an olive branch of reconciliation by offering to seat three of FMC's directors. Ultimately, the shareholder meeting was postponed.

97.     On July 16, 2013, FMC commenced an action in the Court of Chancery of the State of Delaware, naming the then-serving members of the board of directors of the Company as defendants and the Company as a nominal defendant. The action was captioned First Manhattan Co. v. Leland F. Wilson, et al., C.A. No. 8731-VCL. First Manhattan alleged that the Company's directors breached their fiduciary duties in connection with the board's decision to adjourn the annual stockholders meeting from July 15, 2013 until July 18, 2013. The verified complaint sought declaratory and injunctive relief, including enjoining the defendants from soliciting proxies, directing the inspector of elections to certify the election of directors based on votes that were present and prepared to be voted on July 15, 2013 before the annual stockholders meeting was adjourned, and prohibiting defendants from taking any actions as directors of the Company. The verified complaint did not seek damages from the Company or the defendant board members.

98.     The parties entered into a settlement agreement on July 18, 2013, and the action was dismissed with prejudice on July 19, 2013. As part of the settlement agreement with First Manhattan, the

Complaint for Violations of the Federal Securities Laws

Company agreed to pay the reasonable and documented expenses incurred by First Manhattan in connection with its proxy contest, which First Manhattan has advised the Company to be approximately $3.5 million.

99.   This Settlement Agreement also terminated the pending proxy contest with respect to the election of the Company's board of directors, or the Board, at the Company's 2013 annual meeting of stockholders, or the Annual Meeting. Pursuant to the Settlement Agreement, Vivus, among other things, reconstituted the Board with the following individuals: Michael James Astrue, J. Martin Carroll, Samuel F. Colin, M.D., Alexander J. Denner, Ph.D., Johannes J.P. Kastelein, Mark B. Logan, David York Norton, Jorge Plutzky, M.D., Herman Rosenman and Robert N. Wilson.

100.   In connection therewith, Charles J. Casamento, Ernest Mario, Ph.D., Linda M. Dairiki Shortliffe, M.D., Peter Y. Tam, and Leland F. Wilson resigned as directors of the Company. Also in connection with the Settlement Agreement, Leland Wilson resigned as Chief Executive Officer of the Company. On July 22, 2013, the reconstituted Board appointed Anthony P. Zook to serve as Chief Executive Officer. On July 25, 2013, Mr. Zook was also appointed to the Board as the eleventh member of the reconstituted Board. In connection with the Settlement Agreement, the Board has authorized the reimbursement of approximately $3.5 million to First Manhattan of expenses incurred by First Manhattan in connection with its proxy solicitation.

101.   After the proxy fight was resolved, plaintiff Thomas Jasin contacted Dr. Samuel Colin, one of the new Vivus Directors, directly. Plaintiff Thomas Jasin had communicated with Dr. Colin previously, in relation to FMC's proxy battle. At that time, plaintiff Thomas Jasin and Dr. Colin had spoken and communicated by email about the Company. Now, Dr. Colin was a new Director of Vivus, having been put in place by FMC per the terms of the settlement above. Plaintiff Thomas Jasin congratulated Dr. Colin on winning the proxy fight and engaged in small talk. When discussing the proxy fight, and the recent happenings with the Company, Dr. Colin told plaintiff Thomas Jasin that he "wouldn't believe what we've uncovered since getting there." When plaintiff Thomas Jasin attempted to follow up on this and obtain more information, he was told that in light of Dr. Colin's new position at the Company, he probably should not repeat it. This plausibly suggests that there is significant

Complaint for Violations of the Federal Securities Laws

additional material information that should have been disclosed relating to Vivus's financial condition and Qsymia's prospects during 2012.

## LOSS CAUSATION

102.   As a result of Defendants' false statements, Vivus common stock traded at artificially inflated levels.

103.   However, this artificial inflation was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. The corrective information was disseminated through several partial disclosures that revealed the truth. These disclosures, more particularly described above, reduced the price of Vivus's common stock, causing economic injury to Plaintiffs. after the above revelations seeped into the market, investors sold the Company's shares, causing the shares to drop significantly from their inflated prices.

104.   During the relevant time period, as detailed above, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Vivus common stock, and operated as a fraud or deceit on Plaintiffs as purchasers of Vivus common stock by misrepresenting the likelihood of success Qsymia would have in the United States and Europe.

105.   The spreadsheet attached to the complaint as Exhibit A details Plaintiffs' securities transactions involving Vivus common stock and their losses as a result of Defendants' false and misleading statements. Plaintiffs also purchased and sold options during the same time period, but still suffered a net loss of nearly $3 million on Vivus equity transactions.

Complaint for Violations of the Federal Securities Laws

106.    The graph below reflects the movement of Vivus's stock price from the date Plaintiffs made their first purchase of Vivus stock to when they sold their last share of Vivus stock:



107.    The table attached as Exhibit B provides the historical stock price of Vivus from when Plaintiffs purchased their first share of Vivus stock to when they sold their last share of Vivus stock.

## SCIENTER

108.    Defendants acted with scienter throughout the events described above. Defendants' own internal information contradicted the statements they made publicly. Defendants accordingly had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them. In so doing, Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on Plaintiffs as purchasers of Vivus common stock.

109.    In addition to having actual knowledge and/or recklessly disregarding the fraudulent nature of their statements and conduct, each of the Defendants also had a strong motive to engage in the fraudulent scheme set forth herein. Maintaining a strong stock price was essential to maintaining the

artificially inflated value of each of the Individual Defendants' holdings of Vivus shares. Disclosure of the true facts would have seriously impaired Vivus' position in the pharmaceuticals marketplace.

## NO SAFE HARBOR

110. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. First, the statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Second, the statutory safe harbor does not apply to statements included in financial statements that purport to have been prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

111. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Vivus who knew that the statement was materially false or misleading when made.

## PLAINTIFFS RELIED ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

112. As stated throughout this Complaint, Plaintiffs relied directly on statements from Defendants and Vivus' officers and directors when purchasing their shares of Vivus.

113. In addition, Plaintiffs are entitled to a presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    a. Defendants made public misrepresentations or failed to disclose material facts during the described time period;

    b. the omissions and misrepresentations were material;

    c. the Company's stock traded in an efficient market;

d.   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.   Plaintiffs purchased Vivus common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

114.   At all relevant times, the markets for Vivus common stock were efficient for the following reasons, among others:

a.   as a regulated issuer, Vivus filed periodic public reports with the SEC;

b.   Vivus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

c.   Vivus common stock was actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "VVUS."

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

115.   Plaintiffs incorporate the foregoing paragraphs by reference.

116.   During the described time period, Defendants disseminated or approved the false statements specified above, which they knew, or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a.   employed devices, schemes, and artifices to defraud;

Complaint for Violations of the Federal Securities Laws

b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Vivus common stock during the relevant time period.

118.   Plaintiffs have suffered damages in that, in reliance on Defendants' false statements and on the integrity of the market, they paid artificially inflated prices for Vivus common stock. Plaintiffs would not have purchased Vivus common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

119.   The other members of the Class suffered damages in connection with their purchases of Vivus common stock during the relevant time period.

## COUNT II

## VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

120.   Plaintiffs incorporate the foregoing paragraphs by reference.

121.   The Individual Defendants acted as controlling persons of Vivus within the meaning of Section 20(a) of the Exchange Act. By virtue of their power to control public statements about Vivus, the Individual Defendants had the power and authority to control Vivus and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   Awarding Plaintiffs their actual damages, or an amount to be determined at trial;

B.   Awarding Plaintiffs the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiffs' attorneys and experts;

C.   Awarding punitive and exemplary damages; and

D.   Granting Plaintiffs such further relief as the Court may deem just and proper.

Complaint for Violations of the Federal Securities Laws

1

## JURY TRIAL DEMANDED

2

Plaintiffs hereby demand a trial by jury.

3

Dated: July 18, 2014

FINKELSTEIN THOMPSON LLP

4

*Rosemary M. Rivas*

5

Rosemary M. Rivas

6

505 Montgomery Street, Suite 300

San Francisco, CA 94111

7

Telephone: (415) 398-8700

Facsimile: (415) 398-8704

8

rrivas@finkelsteinthompson.com

9

10

L. Kendall Satterfield

Michael G. McLellan

11

Eugene J. Benick

12

Finkelstein Thompson LLP

James Place

13

1077 30th Street, NW

Suite 150

14

Washington, D.C. 20007

15

Telephone: (202) 337-8000

Facsimile: (202) 337-8090

16

ksatterfield@finkelsteinthompson.com

17

mmclellan@finkelsteinthompson.com

ebenick@finkelsteinthompson.com

18

19

20

21

22

23

24

25

26

27

28

Complaint for Violations of the Federal Securities Laws

# EXHIBIT A

# Exhibit A - Timeline of Vivus Stock Transactions

## Timeline of Vivus Stock Equity Transactions

| Date | Description | Bought # of Shares | Bought Price Per Share | Cost | Sold # of Shares | Sold Price Per Share | Proceeds | Cum Shares | Price Price Share @ Close | Stock Value@Close | Cum Cost | Cum Gain/Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/27/2012 | Buy Stock | 50,000 | $24.10 | -$1,205,004.00 | | | | 50,000 | $23.78 | $1,189,000.00 | -$1,205,004.00 | -$16,004.00 |
| 2/27/2012 | Buy Stock | 50,000 | $24.40 | -$1,220,004.00 | | | | 100,000 | $23.78 | $2,378,000.00 | -$2,425,008.00 | -$47,008.00 |
| 2/28/2012 | | | | | | | | 100,000 | $21.26 | | | -$299,008.00 |
| 2/29/2012 | | | | | | | | 100,000 | $22.50 | | | -$175,008.00 |
| 4/20/2012 | Buy Stock (from option assignment) | 100,000 | $30.00 | -$3,000,005.00 | | | | 200,000 | $22.95 | $4,590,000.00 | -$5,425,013.00 | -$835,013.00 |
| 4/23/2012 | Sell Stock | | | | 521 | $22.72 | $11,833.00 | 199,479 | $22.70 | $4,528,173.00 | -$5,413,180.00 | -$885,007.00 |
| 7/17/2012 | Sell Stock | | | | 50,367 | $22.583 avg | $1,137,459.00 | | $22.70 | | | |
| 7/17/2012 | Buy Stock | 13,321 | $26.27 avg | -$349,957.00 | | | | 212,800 | $26.46 | $5,630,688.00 | -$5,763,137.00 | -$132,449.00 |
| 7/19/2012 | Sell Stock | | | | 8,500 | $25.58 avg | $217,401.00 | 203,800 | $25.78 | $5,253,964.00 | -$5,564,248.00 | -$310,284.00 |
| 7/20/2012 | Buy Stock (from option assignment) | 48,500 | $30.00 | -$1,455,000.00 | | | | 252,300 | $24.15 | $6,093,045.00 | -$7,019,248.00 | -$926,203.00 |
| 7/20/2012 | Sell Stock | | | | 50,367 | $22.583 avg | $1,137,459.00 | 201,933 | $24.15 | $4,876,682.00 | -$5,881,789.00 | -$1,005,107.00 |
| 7/25/2012 | Buy Stock | 10,000 | $22.30 | -$223,015.00 | | | | 211,933 | $24.28 | $4,760,674.00 | -$6,104,804.00 | -$1,404,130.00 |
| 7/30/2012 | Buy Stock | 13,067 | $21.90 | -$286,188.00 | | | | 225,000 | $22.28 | $5,013,000.00 | -$6,390,992.00 | -$1,377,992.00 |
| 8/17/2012 | Buy Stock | 15,250 | $21.60 | -$359,423.00 | | | | 240,250 | $21.81 | $5,239,853.00 | -$6,720,415.00 | -$1,480,562.00 |
| 8/20/2012 | Sell Stock | | | | 6,300 | $20.775 avg | $130,885.00 | 233,950 | $20.76 | $4,856,802.00 | -$6,589,530.00 | -$1,732,728.00 |
| 9/20/2012 | Sell Stock | | | | 3,150 | $23.687 avg | $74,613.00 | 230,800 | $23.72 | $5,474,576.00 | -$6,514,917.00 | -$1,040,341.00 |
| 9/20/2012 | Buy Stock (from option assignment) | 80,000 | $24.00 | -$1,920,000.00 | | | | 310,800 | $21.00 | $6,526,800.00 | -$8,434,917.00 | -$1,908,117.00 |
| 9/21/2012 | Sell Stock | | | | 235,800 | $20.834 avg | $4,912,545.00 | 75,000 | $21.00 | $1,575,000.00 | -$3,522,372.00 | -$1,947,372.00 |
| 9/21/2012 | Sell Stock | | | | | | | 175,000 | $21.00 | $3,675,000.00 | -$5,929,674.00 | -$2,254,674.00 |
| 9/24/2012 | Buy Stock | 100,000 | $20.502 avg | -$2,050,392.00 | | | | 160,900 | $18.96 | $3,050,664.00 | -$5,305,227.00 | -$2,254,563.00 |
| 9/24/2012 | Sell Stock | | | | 14,100 | $18.968 avg | $267,447.00 | 159,000 | $18.95 | $3,013,050.00 | -$5,375,376.00 | -$2,362,326.00 |
| 9/25/2012 | Sell Stock | | | | 1,900 | | $34,591.00 | 139,400 | $18.29 | $2,549,110.00 | -$4,930,680.00 | -$2,349,570.00 |
| 9/26/2012 | Sell Stock | | | | 19,600 | $17.345 avg | $339,956.00 | 139,400 | $17.90 | $2,495,260.00 | -$4,845,216.00 | -$2,349,721.00 |
| 10/2/2012 | Buy Stock | 15,600 | $18.25 | -$284,725.00 | | | | 155,000 | $18.38 | $2,848,900.00 | -$5,194,941.00 | -$2,349,731.00 |
| 10/2/2012 | Buy Stock | 19,900 | $19.03 | -$378,721.00 | | | | 174,900 | $18.55 | $3,244,395.00 | -$5,594,162.00 | -$2,349,697.00 |
| 10/5/2012 | Sell Stock | | | | 14,900 | $18.552 avg | $276,429.00 | 160,000 | $18.55 | $2,968,000.00 | -$5,317,697.00 | -$2,349,697.00 |
| 10/5/2012 | Buy Stock | 3,200 | $21.362 avg | -$568,357.00 | | | | 163,200 | $21.06 | $3,436,992.00 | -$5,386,054.00 | -$1,949,060.00 |
| 10/18/2012 | Sell Stock | | | | 12,200 | $21.020 avg | $256,449.00 | 151,000 | $21.06 | $3,180,060.00 | -$5,129,605.00 | -$1,949,545.00 |
| 10/18/2012 | Buy Stock | | | -$1,153,492 | | | | | | | | |
| 10/19/2012 | Buy Stock (from option assignment) | 53,075 | $21.733 avg | -$1,153,492 | | | | 204,075 | $20.60 | $4,203,945.00 | -$6,283,097.00 | -$2,079,298.00 |
| 10/19/2012 | Sell Stock | | | | 15,100 | $20.590 avg | $310,914.00 | 188,975 | $20.60 | $3,892,885.00 | -$5,972,183.00 | -$2,079,298.00 |
| 10/22/2012 | Sell Stock | | | | 36,500 | $19.455 avg | $710,101.00 | 195,200 | $19.48 | $3,802,496.00 | -$6,094,932.00 | -$2,292,436.00 |
| 10/22/2012 | Buy Stock | 6,225 | $19.719 avg | -$122,749.00 | | | | 158,700 | $19.48 | $3,091,476.00 | -$5,384,831.00 | -$2,293,355.00 |
| 10/23/2012 | Sell Stock | | | | 10,700 | $18.80 | $201,134.00 | 195,200 | $18.88 | $2,794,240.00 | -$5,183,697.00 | -$2,389,457.00 |
| 10/25/2012 | Sell Stock | | | | 26,900 | $17.740 avg | $477,209.00 | 121,100 | $18.88 | $2,286,368.00 | -$4,706,488.00 | -$2,420,120.00 |
| 10/31/2012 | Sell Stock | | | | 50,300 | $15.866 avg | $798,049.00 | 70,800 | $14.33 | $1,014,564.00 | -$3,908,439.00 | -$2,893,989.00 |
| 11/2/2012 | Buy Stock | 82,000 | $14.90 | -$2,980.00 | | | | 153,000 | $14.33 | $2,192,490.00 | -$5,911,419.00 | -$2,853,519.00 |
| 11/5/2012 | Buy Stock | 200 | $14.959 avg | -$1,227,167.00 | | | | 71,000 | $14.33 | $1,017,430.00 | -$3,911,629.00 | -$2,893,989.00 |
| 11/5/2012 | Sell Stock | | | | 76,000 | $14.50 | $1,101,853.00 | 77,000 | $14.95 | $1,151,150.00 | -$4,036,733.00 | -$2,885,583.00 |
| 11/6/2012 | Sell Stock | | | | 51,500 | $12.484 avg | $642,914.00 | 25,500 | $11.82 | $301,410.00 | -$3,393,819.00 | -$3,092,409.00 |
| 11/16/2012 | Buy Stock (from option assignment) | 5,500 | $11.00 | -$560,500.00 | | | | 31,000 | $10.33 | $320,230.00 | -$3,454,319.00 | -$3,134,089.00 |
| 12/26/2012 | Sell Stock | | | | 4,100 | $13.138 avg | $53,865.00 | 26,900 | $13.16 | $354,004.00 | -$3,400,454.00 | -$3,046,450.00 |
| 12/28/2012 | Sell Stock | | | | 400 | $13.213 avg | $5,285.00 | 26,500 | $13.21 | $350,065.00 | -$3,395,169.00 | -$3,045,104.00 |
| 2/26/2013 | Sell Stock | | | | 24,742 | $10.887 avg | $269,617.00 | 1,758 | $10.89 | $19,145.00 | -$3,125,552.00 | -$3,106,100.00 |
| 4/19/2013 | Sell Stock | | | | 1,758 | $12.718 avg | $22,359.00 | 0 | $11.93 | $0.00 | -$3,103,193.00 | -$3,108,193.00 |

# EXHIBIT B

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Vivus (NASDAQ: VVUS) Historical Stock Prices | | | | | | |
| 2 | Date | Open | High | Low | Close | Volume | Adj Close |
| 3 | 4/19/2013 | $ 12.60 | $ 12.71 | $ 11.82 | $ 11.93 | 3,702,000.00 | $ 11.93 |
| 4 | 4/18/2013 | $ 12.29 | $ 12.40 | $ 11.57 | $ 12.09 | 2,099,100.00 | $ 12.09 |
| 5 | 4/17/2013 | $ 11.82 | $ 12.25 | $ 11.64 | $ 12.17 | 3,639,000.00 | $ 12.17 |
| 6 | 4/16/2013 | $ 11.29 | $ 12.35 | $ 11.08 | $ 11.78 | 6,461,100.00 | $ 11.78 |
| 7 | 4/15/2013 | $ 11.58 | $ 11.64 | $ 11.08 | $ 11.16 | 1,391,400.00 | $ 11.16 |
| 8 | 4/12/2013 | $ 11.49 | $ 11.71 | $ 11.29 | $ 11.65 | 786,300.00 | $ 11.65 |
| 9 | 4/11/2013 | $ 11.30 | $ 11.65 | $ 11.22 | $ 11.52 | 1,985,900.00 | $ 11.52 |
| 10 | 4/10/2013 | $ 10.89 | $ 11.29 | $ 10.82 | $ 11.25 | 2,067,100.00 | $ 11.25 |
| 11 | 4/9/2013 | $ 10.48 | $ 11.18 | $ 10.44 | $ 10.83 | 2,126,300.00 | $ 10.83 |
| 12 | 4/8/2013 | $ 10.47 | $ 10.66 | $ 10.24 | $ 10.46 | 931,600.00 | $ 10.46 |
| 13 | 4/5/2013 | $ 10.33 | $ 10.58 | $ 10.28 | $ 10.43 | 928,100.00 | $ 10.43 |
| 14 | 4/4/2013 | $ 10.62 | $ 10.65 | $ 10.33 | $ 10.51 | 1,088,200.00 | $ 10.51 |
| 15 | 4/3/2013 | $ 10.76 | $ 10.88 | $ 10.39 | $ 10.57 | 1,349,600.00 | $ 10.57 |
| 16 | 4/2/2013 | $ 10.75 | $ 10.94 | $ 10.59 | $ 10.76 | 1,808,800.00 | $ 10.76 |
| 17 | 4/1/2013 | $ 11.04 | $ 11.07 | $ 10.55 | $ 10.69 | 2,037,400.00 | $ 10.69 |
| 18 | 3/28/2013 | $ 10.74 | $ 11.20 | $ 10.62 | $ 11.00 | 1,500,100.00 | $ 11.00 |
| 19 | 3/27/2013 | $ 10.61 | $ 10.79 | $ 10.32 | $ 10.69 | 1,689,200.00 | $ 10.69 |
| 20 | 3/26/2013 | $ 10.99 | $ 11.00 | $ 10.39 | $ 10.63 | 2,094,300.00 | $ 10.63 |
| 21 | 3/25/2013 | $ 10.91 | $ 11.07 | $ 10.78 | $ 10.94 | 1,322,900.00 | $ 10.94 |
| 22 | 3/22/2013 | $ 10.97 | $ 11.10 | $ 10.79 | $ 10.84 | 889,400.00 | $ 10.84 |
| 23 | 3/21/2013 | $ 10.71 | $ 11.00 | $ 10.71 | $ 10.94 | 1,309,800.00 | $ 10.94 |
| 24 | 3/20/2013 | $ 10.74 | $ 10.89 | $ 10.67 | $ 10.81 | 1,274,100.00 | $ 10.81 |
| 25 | 3/19/2013 | $ 10.88 | $ 11.00 | $ 10.63 | $ 10.72 | 1,560,700.00 | $ 10.72 |
| 26 | 3/18/2013 | $ 11.11 | $ 11.17 | $ 10.85 | $ 10.87 | 2,002,400.00 | $ 10.87 |
| 27 | 3/15/2013 | $ 11.27 | $ 11.39 | $ 11.09 | $ 11.20 | 2,243,700.00 | $ 11.20 |
| 28 | 3/14/2013 | $ 11.54 | $ 11.59 | $ 11.12 | $ 11.27 | 1,662,600.00 | $ 11.27 |
| 29 | 3/13/2013 | $ 11.72 | $ 11.79 | $ 11.46 | $ 11.54 | 1,846,700.00 | $ 11.54 |
| 30 | 3/12/2013 | $ 11.79 | $ 11.83 | $ 11.51 | $ 11.68 | 1,583,000.00 | $ 11.68 |
| 31 | 3/11/2013 | $ 11.65 | $ 11.88 | $ 11.40 | $ 11.79 | 1,835,900.00 | $ 11.79 |
| 32 | 3/8/2013 | $ 11.72 | $ 11.91 | $ 11.48 | $ 11.70 | 3,409,800.00 | $ 11.70 |
| 33 | 3/7/2013 | $ 11.12 | $ 11.74 | $ 11.12 | $ 11.42 | 4,623,800.00 | $ 11.42 |
| 34 | 3/6/2013 | $ 10.77 | $ 11.24 | $ 10.53 | $ 11.10 | 4,163,800.00 | $ 11.10 |
| 35 | 3/5/2013 | $ 10.14 | $ 10.47 | $ 9.95 | $ 10.44 | 5,483,000.00 | $ 10.44 |
| 36 | 3/4/2013 | $ 10.24 | $ 10.24 | $ 10.02 | $ 10.20 | 3,364,600.00 | $ 10.20 |
| 37 | 3/1/2013 | $ 10.61 | $ 10.65 | $ 10.15 | $ 10.34 | 4,361,400.00 | $ 10.34 |
| 38 | 2/28/2013 | $ 10.93 | $ 10.98 | $ 10.49 | $ 10.71 | 4,144,400.00 | $ 10.71 |
| 39 | 2/27/2013 | $ 10.91 | $ 11.18 | $ 10.80 | $ 10.98 | 2,685,700.00 | $ 10.98 |
| 40 | 2/26/2013 | $ 11.63 | $ 12.05 | $ 10.75 | $ 10.89 | 7,429,800.00 | $ 10.89 |
| 41 | 2/25/2013 | $ 12.68 | $ 13.05 | $ 12.34 | $ 12.41 | 2,457,100.00 | $ 12.41 |
| 42 | 2/22/2013 | $ 12.40 | $ 12.72 | $ 12.14 | $ 12.58 | 2,873,700.00 | $ 12.58 |
| 43 | 2/21/2013 | $ 13.10 | $ 13.32 | $ 12.69 | $ 12.88 | 2,186,300.00 | $ 12.88 |
| 44 | 2/20/2013 | $ 13.45 | $ 13.65 | $ 13.10 | $ 13.13 | 1,915,500.00 | $ 13.13 |
| 45 | 2/19/2013 | $ 13.47 | $ 13.52 | $ 13.15 | $ 13.46 | 1,755,900.00 | $ 13.46 |
| 46 | 2/15/2013 | $ 13.78 | $ 13.80 | $ 13.36 | $ 13.39 | 2,027,900.00 | $ 13.39 |

Source: Yahoo! Finance                                                    1

|    | A | B | C | D | E | F | G |
|----|---|---|---|---|---|---|---|
| 47 | 2/14/2013 | $ 13.42 | $ 13.84 | $ 13.27 | $ 13.76 | 1,735,100.00 | $ 13.76 |
| 48 | 2/13/2013 | $ 13.51 | $ 13.64 | $ 13.16 | $ 13.41 | 2,047,000.00 | $ 13.41 |
| 49 | 2/12/2013 | $ 13.47 | $ 13.65 | $ 13.21 | $ 13.54 | 1,226,200.00 | $ 13.54 |
| 50 | 2/11/2013 | $ 13.52 | $ 13.79 | $ 13.20 | $ 13.42 | 2,064,000.00 | $ 13.42 |
| 51 | 2/8/2013 | $ 13.30 | $ 13.96 | $ 13.30 | $ 13.58 | 4,041,900.00 | $ 13.58 |
| 52 | 2/7/2013 | $ 13.49 | $ 13.56 | $ 13.06 | $ 13.37 | 2,668,700.00 | $ 13.37 |
| 53 | 2/6/2013 | $ 13.17 | $ 13.49 | $ 13.00 | $ 13.45 | 4,252,700.00 | $ 13.45 |
| 54 | 2/5/2013 | $ 12.41 | $ 13.06 | $ 12.08 | $ 12.96 | 5,815,100.00 | $ 12.96 |
| 55 | 2/4/2013 | $ 12.39 | $ 12.40 | $ 12.11 | $ 12.16 | 2,760,200.00 | $ 12.16 |
| 56 | 2/1/2013 | $ 12.81 | $ 12.87 | $ 12.21 | $ 12.43 | 5,439,700.00 | $ 12.43 |
| 57 | 1/31/2013 | $ 12.05 | $ 12.34 | $ 11.96 | $ 12.11 | 2,205,300.00 | $ 12.11 |
| 58 | 1/30/2013 | $ 12.38 | $ 12.62 | $ 11.94 | $ 12.04 | 2,550,000.00 | $ 12.04 |
| 59 | 1/29/2013 | $ 12.34 | $ 12.67 | $ 12.13 | $ 12.39 | 1,896,500.00 | $ 12.39 |
| 60 | 1/28/2013 | $ 12.32 | $ 12.77 | $ 11.89 | $ 12.37 | 4,051,800.00 | $ 12.37 |
| 61 | 1/25/2013 | $ 12.99 | $ 13.02 | $ 12.30 | $ 12.39 | 4,983,000.00 | $ 12.39 |
| 62 | 1/24/2013 | $ 13.24 | $ 13.44 | $ 12.94 | $ 12.98 | 2,829,300.00 | $ 12.98 |
| 63 | 1/23/2013 | $ 13.66 | $ 13.74 | $ 13.14 | $ 13.33 | 2,277,600.00 | $ 13.33 |
| 64 | 1/22/2013 | $ 13.34 | $ 13.73 | $ 12.97 | $ 13.63 | 3,690,100.00 | $ 13.63 |
| 65 | 1/18/2013 | $ 13.89 | $ 13.89 | $ 13.22 | $ 13.37 | 3,064,600.00 | $ 13.37 |
| 66 | 1/17/2013 | $ 13.88 | $ 13.98 | $ 13.44 | $ 13.72 | 5,197,800.00 | $ 13.72 |
| 67 | 1/16/2013 | $ 14.79 | $ 14.84 | $ 14.20 | $ 14.32 | 2,757,200.00 | $ 14.32 |
| 68 | 1/15/2013 | $ 14.06 | $ 14.72 | $ 13.82 | $ 14.61 | 4,519,400.00 | $ 14.61 |
| 69 | 1/14/2013 | $ 13.89 | $ 14.44 | $ 13.81 | $ 13.95 | 4,756,600.00 | $ 13.95 |
| 70 | 1/11/2013 | $ 14.20 | $ 14.30 | $ 13.63 | $ 13.89 | 3,727,800.00 | $ 13.89 |
| 71 | 1/10/2013 | $ 14.52 | $ 14.52 | $ 13.89 | $ 14.06 | 4,902,500.00 | $ 14.06 |
| 72 | 1/9/2013 | $ 14.58 | $ 14.60 | $ 14.28 | $ 14.43 | 3,317,200.00 | $ 14.43 |
| 73 | 1/8/2013 | $ 14.91 | $ 15.12 | $ 14.15 | $ 14.43 | 10,322,700.00 | $ 14.43 |
| 74 | 1/7/2013 | $ 15.05 | $ 15.54 | $ 14.63 | $ 14.87 | 18,602,300.00 | $ 14.87 |
| 75 | 1/4/2013 | $ 13.13 | $ 13.80 | $ 13.05 | $ 13.75 | 5,368,900.00 | $ 13.75 |
| 76 | 1/3/2013 | $ 12.78 | $ 13.35 | $ 12.72 | $ 13.01 | 4,177,600.00 | $ 13.01 |
| 77 | 1/2/2013 | $ 13.80 | $ 13.82 | $ 12.65 | $ 12.83 | 5,383,800.00 | $ 12.83 |
| 78 | 12/31/2012 | $ 13.15 | $ 13.50 | $ 13.12 | $ 13.42 | 3,393,700.00 | $ 13.42 |
| 79 | 12/28/2012 | $ 13.30 | $ 13.80 | $ 13.20 | $ 13.21 | 2,791,000.00 | $ 13.21 |
| 80 | 12/27/2012 | $ 13.14 | $ 14.01 | $ 13.10 | $ 13.67 | 4,684,900.00 | $ 13.67 |
| 81 | 12/26/2012 | $ 13.52 | $ 13.53 | $ 13.13 | $ 13.16 | 2,367,600.00 | $ 13.16 |
| 82 | 12/24/2012 | $ 13.40 | $ 13.68 | $ 13.23 | $ 13.40 | 1,511,500.00 | $ 13.40 |
| 83 | 12/21/2012 | $ 13.40 | $ 13.55 | $ 12.90 | $ 13.42 | 6,638,500.00 | $ 13.42 |
| 84 | 12/20/2012 | $ 14.65 | $ 14.71 | $ 13.69 | $ 13.70 | 13,827,200.00 | $ 13.70 |
| 85 | 12/19/2012 | $ 13.15 | $ 14.17 | $ 12.94 | $ 13.64 | 9,708,300.00 | $ 13.64 |
| 86 | 12/18/2012 | $ 13.11 | $ 13.47 | $ 12.85 | $ 13.14 | 5,737,700.00 | $ 13.14 |
| 87 | 12/17/2012 | $ 11.90 | $ 13.49 | $ 11.90 | $ 13.08 | 12,257,600.00 | $ 13.08 |
| 88 | 12/14/2012 | $ 11.51 | $ 11.68 | $ 11.44 | $ 11.48 | 2,862,200.00 | $ 11.48 |
| 89 | 12/13/2012 | $ 11.73 | $ 11.90 | $ 11.43 | $ 11.55 | 2,266,000.00 | $ 11.55 |
| 90 | 12/12/2012 | $ 11.65 | $ 12.09 | $ 11.63 | $ 11.75 | 5,105,500.00 | $ 11.75 |
| 91 | 12/11/2012 | $ 11.03 | $ 11.65 | $ 10.95 | $ 11.54 | 4,432,500.00 | $ 11.54 |
| 92 | 12/10/2012 | $ 10.63 | $ 11.04 | $ 10.60 | $ 10.94 | 2,769,700.00 | $ 10.94 |

|     | A | B | C | D | E | F | G |
|-----|-----------|---------|---------|---------|---------|---------------|---------|
| 93  | 12/7/2012 | $ 10.99 | $ 11.15 | $ 10.32 | $ 10.54 | 3,487,900.00 | $ 10.54 |
| 94  | 12/6/2012 | $ 11.00 | $ 11.09 | $ 10.53 | $ 10.79 | 3,422,700.00 | $ 10.79 |
| 95  | 12/5/2012 | $ 11.35 | $ 11.35 | $ 10.98 | $ 11.01 | 2,749,300.00 | $ 11.01 |
| 96  | 12/4/2012 | $ 11.35 | $ 11.41 | $ 11.07 | $ 11.39 | 2,915,900.00 | $ 11.39 |
| 97  | 12/3/2012 | $ 11.52 | $ 11.61 | $ 11.25 | $ 11.37 | 2,061,000.00 | $ 11.37 |
| 98  | 11/30/2012 | $ 11.48 | $ 11.60 | $ 11.15 | $ 11.30 | 1,874,800.00 | $ 11.30 |
| 99  | 11/29/2012 | $ 11.42 | $ 11.72 | $ 11.26 | $ 11.44 | 2,520,600.00 | $ 11.44 |
| 100 | 11/28/2012 | $ 11.35 | $ 11.39 | $ 11.06 | $ 11.36 | 2,865,800.00 | $ 11.36 |
| 101 | 11/27/2012 | $ 11.13 | $ 11.81 | $ 11.02 | $ 11.41 | 3,845,200.00 | $ 11.41 |
| 102 | 11/26/2012 | $ 11.35 | $ 11.44 | $ 10.88 | $ 11.16 | 4,537,500.00 | $ 11.16 |
| 103 | 11/23/2012 | $ 11.95 | $ 12.02 | $ 11.35 | $ 11.43 | 2,733,700.00 | $ 11.43 |
| 104 | 11/21/2012 | $ 10.34 | $ 12.59 | $ 10.34 | $ 11.73 | 16,635,600.00 | $ 11.73 |
| 105 | 11/20/2012 | $ 10.30 | $ 10.85 | $ 10.15 | $ 10.35 | 3,310,500.00 | $ 10.35 |
| 106 | 11/19/2012 | $ 10.41 | $ 10.48 | $ 10.12 | $ 10.29 | 3,530,300.00 | $ 10.29 |
| 107 | 11/16/2012 | $ 10.53 | $ 10.67 | $ 10.14 | $ 10.33 | 2,833,100.00 | $ 10.33 |
| 108 | 11/15/2012 | $ 10.62 | $ 10.62 | $ 9.86 | $ 10.27 | 5,527,500.00 | $ 10.27 |
| 109 | 11/14/2012 | $ 11.44 | $ 11.45 | $ 10.39 | $ 10.68 | 4,872,100.00 | $ 10.68 |
| 110 | 11/13/2012 | $ 11.17 | $ 11.58 | $ 11.00 | $ 11.44 | 3,848,000.00 | $ 11.44 |
| 111 | 11/12/2012 | $ 11.20 | $ 11.52 | $ 10.87 | $ 11.37 | 8,173,900.00 | $ 11.37 |
| 112 | 11/9/2012 | $ 10.02 | $ 11.00 | $ 10.00 | $ 10.84 | 6,981,000.00 | $ 10.84 |
| 113 | 11/8/2012 | $ 10.85 | $ 10.86 | $ 10.16 | $ 10.24 | 6,357,900.00 | $ 10.24 |
| 114 | 11/7/2012 | $ 11.37 | $ 11.41 | $ 10.60 | $ 10.96 | 10,067,800.00 | $ 10.96 |
| 115 | 11/6/2012 | $ 13.25 | $ 13.69 | $ 11.00 | $ 11.82 | 24,264,600.00 | $ 11.82 |
| 116 | 11/5/2012 | $ 14.36 | $ 15.25 | $ 13.50 | $ 14.95 | 6,243,400.00 | $ 14.95 |
| 117 | 11/2/2012 | $ 15.13 | $ 15.40 | $ 14.31 | $ 14.33 | 3,451,000.00 | $ 14.33 |
| 118 | 11/1/2012 | $ 14.70 | $ 15.09 | $ 14.12 | $ 15.03 | 5,057,600.00 | $ 15.03 |
| 119 | 10/31/2012 | $ 17.21 | $ 17.27 | $ 14.61 | $ 14.90 | 7,760,700.00 | $ 14.90 |
| 120 | 10/26/2012 | $ 17.84 | $ 18.33 | $ 17.53 | $ 17.55 | 1,622,100.00 | $ 17.55 |
| 121 | 10/25/2012 | $ 18.80 | $ 18.94 | $ 17.45 | $ 17.92 | 2,789,000.00 | $ 17.92 |
| 122 | 10/24/2012 | $ 18.93 | $ 19.18 | $ 18.69 | $ 18.71 | 1,749,800.00 | $ 18.71 |
| 123 | 10/23/2012 | $ 19.35 | $ 19.35 | $ 18.66 | $ 18.88 | 2,034,900.00 | $ 18.88 |
| 124 | 10/22/2012 | $ 20.62 | $ 20.70 | $ 19.05 | $ 19.48 | 3,593,100.00 | $ 19.48 |
| 125 | 10/19/2012 | $ 20.68 | $ 21.52 | $ 20.50 | $ 20.60 | 2,309,200.00 | $ 20.60 |
| 126 | 10/18/2012 | $ 22.10 | $ 22.10 | $ 20.83 | $ 21.06 | 3,238,800.00 | $ 21.06 |
| 127 | 10/17/2012 | $ 22.69 | $ 22.72 | $ 22.03 | $ 22.30 | 2,346,100.00 | $ 22.30 |
| 128 | 10/16/2012 | $ 22.92 | $ 22.92 | $ 22.52 | $ 22.71 | 1,487,200.00 | $ 22.71 |
| 129 | 10/15/2012 | $ 23.27 | $ 23.59 | $ 22.50 | $ 22.74 | 3,973,100.00 | $ 22.74 |
| 130 | 10/12/2012 | $ 22.02 | $ 23.41 | $ 21.86 | $ 22.86 | 3,960,500.00 | $ 22.86 |
| 131 | 10/11/2012 | $ 21.96 | $ 22.06 | $ 21.54 | $ 21.94 | 2,366,100.00 | $ 21.94 |
| 132 | 10/10/2012 | $ 21.00 | $ 22.05 | $ 20.89 | $ 21.74 | 4,230,900.00 | $ 21.74 |
| 133 | 10/9/2012 | $ 20.47 | $ 21.20 | $ 20.21 | $ 20.91 | 4,472,700.00 | $ 20.91 |
| 134 | 10/8/2012 | $ 18.45 | $ 20.80 | $ 18.30 | $ 20.44 | 5,632,700.00 | $ 20.44 |
| 135 | 10/5/2012 | $ 19.25 | $ 19.38 | $ 18.50 | $ 18.55 | 1,361,500.00 | $ 18.55 |
| 136 | 10/4/2012 | $ 18.81 | $ 19.20 | $ 18.30 | $ 19.13 | 2,422,200.00 | $ 19.13 |
| 137 | 10/3/2012 | $ 18.51 | $ 18.84 | $ 18.20 | $ 18.75 | 2,273,100.00 | $ 18.75 |
| 138 | 10/2/2012 | $ 18.31 | $ 18.59 | $ 17.90 | $ 18.38 | 2,187,200.00 | $ 18.38 |

|     | A | B | C | D | E | F | G |
|-----|-----------|-----------|-----------|-----------|-----------|--------------|-----------|
| 139 | 10/1/2012 | $ 18.03 | $ 18.70 | $ 17.85 | $ 18.30 | 2,666,400.00 | $ 18.30 |
| 140 | 9/28/2012 | $ 17.72 | $ 18.00 | $ 17.41 | $ 17.81 | 1,488,300.00 | $ 17.81 |
| 141 | 9/27/2012 | $ 18.02 | $ 18.12 | $ 17.70 | $ 17.82 | 2,240,500.00 | $ 17.82 |
| 142 | 9/26/2012 | $ 18.14 | $ 18.26 | $ 17.21 | $ 17.90 | 4,364,600.00 | $ 17.90 |
| 143 | 9/25/2012 | $ 18.81 | $ 19.42 | $ 18.03 | $ 18.29 | 4,950,400.00 | $ 18.29 |
| 144 | 9/24/2012 | $ 20.62 | $ 20.84 | $ 18.82 | $ 18.96 | 7,757,500.00 | $ 18.96 |
| 145 | 9/21/2012 | $ 20.60 | $ 21.60 | $ 20.35 | $ 21.00 | 10,457,100.00 | $ 21.00 |
| 146 | 9/20/2012 | $ 24.22 | $ 24.26 | $ 23.64 | $ 23.72 | 1,396,800.00 | $ 23.72 |
| 147 | 9/19/2012 | $ 24.65 | $ 24.66 | $ 24.06 | $ 24.28 | 1,832,100.00 | $ 24.28 |
| 148 | 9/18/2012 | $ 23.37 | $ 24.86 | $ 23.10 | $ 24.44 | 5,624,700.00 | $ 24.44 |
| 149 | 9/17/2012 | $ 22.00 | $ 22.98 | $ 21.98 | $ 22.93 | 2,643,500.00 | $ 22.93 |
| 150 | 9/14/2012 | $ 22.39 | $ 22.49 | $ 21.94 | $ 22.08 | 1,440,600.00 | $ 22.08 |
| 151 | 9/13/2012 | $ 22.58 | $ 22.61 | $ 22.15 | $ 22.39 | 978,900.00 | $ 22.39 |
| 152 | 9/12/2012 | $ 22.24 | $ 22.86 | $ 22.04 | $ 22.62 | 1,265,700.00 | $ 22.62 |
| 153 | 9/11/2012 | $ 22.49 | $ 22.57 | $ 22.00 | $ 22.26 | 1,618,400.00 | $ 22.26 |
| 154 | 9/10/2012 | $ 22.58 | $ 22.87 | $ 22.15 | $ 22.57 | 1,131,700.00 | $ 22.57 |
| 155 | 9/7/2012 | $ 22.90 | $ 23.10 | $ 22.46 | $ 22.63 | 1,864,200.00 | $ 22.63 |
| 156 | 9/6/2012 | $ 22.34 | $ 22.97 | $ 22.34 | $ 22.88 | 2,510,200.00 | $ 22.88 |
| 157 | 9/5/2012 | $ 22.00 | $ 22.74 | $ 22.00 | $ 22.17 | 1,855,100.00 | $ 22.17 |
| 158 | 9/4/2012 | $ 21.56 | $ 22.20 | $ 21.46 | $ 22.08 | 1,531,100.00 | $ 22.08 |
| 159 | 8/31/2012 | $ 21.73 | $ 21.87 | $ 21.29 | $ 21.45 | 911,400.00 | $ 21.45 |
| 160 | 8/30/2012 | $ 21.81 | $ 21.93 | $ 21.50 | $ 21.51 | 1,156,200.00 | $ 21.51 |
| 161 | 8/29/2012 | $ 21.79 | $ 22.22 | $ 21.60 | $ 21.96 | 1,681,100.00 | $ 21.96 |
| 162 | 8/28/2012 | $ 21.81 | $ 21.89 | $ 21.17 | $ 21.74 | 1,883,500.00 | $ 21.74 |
| 163 | 8/27/2012 | $ 21.63 | $ 22.34 | $ 21.53 | $ 21.90 | 2,065,300.00 | $ 21.90 |
| 164 | 8/24/2012 | $ 21.26 | $ 21.84 | $ 21.05 | $ 21.67 | 1,667,600.00 | $ 21.67 |
| 165 | 8/23/2012 | $ 21.35 | $ 21.45 | $ 21.05 | $ 21.22 | 1,241,700.00 | $ 21.22 |
| 166 | 8/22/2012 | $ 20.71 | $ 21.60 | $ 20.60 | $ 21.38 | 2,685,400.00 | $ 21.38 |
| 167 | 8/21/2012 | $ 20.77 | $ 21.00 | $ 20.24 | $ 20.66 | 3,831,500.00 | $ 20.66 |
| 168 | 8/20/2012 | $ 21.82 | $ 21.87 | $ 20.53 | $ 20.76 | 5,096,000.00 | $ 20.76 |
| 169 | 8/17/2012 | $ 20.89 | $ 21.89 | $ 20.60 | $ 21.81 | 6,169,200.00 | $ 21.81 |
| 170 | 8/16/2012 | $ 22.79 | $ 22.94 | $ 22.52 | $ 22.76 | 1,789,600.00 | $ 22.76 |
| 171 | 8/15/2012 | $ 23.06 | $ 23.18 | $ 22.58 | $ 23.01 | 2,502,100.00 | $ 23.01 |
| 172 | 8/14/2012 | $ 22.21 | $ 23.30 | $ 21.91 | $ 23.24 | 4,687,000.00 | $ 23.24 |
| 173 | 8/13/2012 | $ 21.61 | $ 22.27 | $ 21.50 | $ 21.72 | 1,966,500.00 | $ 21.72 |
| 174 | 8/10/2012 | $ 21.50 | $ 21.70 | $ 21.31 | $ 21.60 | 1,741,300.00 | $ 21.60 |
| 175 | 8/9/2012 | $ 21.77 | $ 22.06 | $ 21.53 | $ 21.66 | 2,434,900.00 | $ 21.66 |
| 176 | 8/8/2012 | $ 22.16 | $ 22.85 | $ 22.02 | $ 22.20 | 5,124,800.00 | $ 22.20 |
| 177 | 8/7/2012 | $ 22.07 | $ 23.52 | $ 22.07 | $ 23.18 | 6,363,500.00 | $ 23.18 |
| 178 | 8/6/2012 | $ 20.87 | $ 21.48 | $ 20.84 | $ 21.22 | 2,189,200.00 | $ 21.22 |
| 179 | 8/3/2012 | $ 20.77 | $ 21.24 | $ 20.50 | $ 20.92 | 2,188,900.00 | $ 20.92 |
| 180 | 8/2/2012 | $ 20.01 | $ 21.25 | $ 19.75 | $ 20.76 | 3,156,000.00 | $ 20.76 |
| 181 | 8/1/2012 | $ 21.20 | $ 21.24 | $ 19.85 | $ 19.96 | 5,958,800.00 | $ 19.96 |
| 182 | 7/31/2012 | $ 22.12 | $ 22.54 | $ 21.02 | $ 21.03 | 4,357,700.00 | $ 21.03 |
| 183 | 7/30/2012 | $ 22.24 | $ 22.52 | $ 21.76 | $ 22.28 | 3,220,900.00 | $ 22.28 |
| 184 | 7/27/2012 | $ 23.09 | $ 23.32 | $ 22.22 | $ 22.35 | 3,444,900.00 | $ 22.35 |

|     | A | B | C | D | E | F | G |
|-----|-----------|-----------|-----------|-----------|-----------|---------------|-----------|
| 185 | 7/26/2012 | $ 22.34 | $ 23.49 | $ 22.25 | $ 23.04 | 4,918,800.00 | $ 23.04 |
| 186 | 7/25/2012 | $ 23.04 | $ 23.13 | $ 22.00 | $ 22.18 | 4,960,100.00 | $ 22.18 |
| 187 | 7/24/2012 | $ 22.32 | $ 23.94 | $ 21.76 | $ 23.00 | 10,014,200.00 | $ 23.00 |
| 188 | 7/23/2012 | $ 23.22 | $ 23.84 | $ 21.87 | $ 22.39 | 11,246,900.00 | $ 22.39 |
| 189 | 7/20/2012 | $ 25.65 | $ 25.65 | $ 21.70 | $ 24.15 | 26,345,200.00 | $ 24.15 |
| 190 | 7/19/2012 | $ 29.12 | $ 29.15 | $ 25.15 | $ 25.78 | 21,784,700.00 | $ 25.78 |
| 191 | 7/18/2012 | $ 30.33 | $ 31.21 | $ 28.80 | $ 29.00 | 37,787,500.00 | $ 29.00 |
| 192 | 7/17/2012 | $ 28.96 | $ 29.90 | $ 20.90 | $ 26.46 | 19,017,200.00 | $ 26.46 |
| 193 | 7/16/2012 | $ 27.55 | $ 29.24 | $ 27.10 | $ 28.71 | 8,894,600.00 | $ 28.71 |
| 194 | 7/13/2012 | $ 28.00 | $ 28.04 | $ 27.11 | $ 27.16 | 3,813,100.00 | $ 27.16 |
| 195 | 7/12/2012 | $ 27.13 | $ 27.97 | $ 26.39 | $ 27.73 | 4,276,300.00 | $ 27.73 |
| 196 | 7/11/2012 | $ 28.48 | $ 28.55 | $ 27.35 | $ 27.49 | 4,330,200.00 | $ 27.49 |
| 197 | 7/10/2012 | $ 28.61 | $ 28.68 | $ 28.35 | $ 28.43 | 3,439,200.00 | $ 28.43 |
| 198 | 7/9/2012 | $ 28.70 | $ 28.95 | $ 28.15 | $ 28.47 | 2,185,000.00 | $ 28.47 |
| 199 | 7/6/2012 | $ 28.35 | $ 28.68 | $ 27.12 | $ 28.51 | 2,979,200.00 | $ 28.51 |
| 200 | 7/5/2012 | $ 29.74 | $ 29.82 | $ 28.83 | $ 28.85 | 4,069,500.00 | $ 28.85 |
| 201 | 7/3/2012 | $ 29.70 | $ 29.99 | $ 29.35 | $ 29.93 | 2,177,900.00 | $ 29.93 |
| 202 | 7/2/2012 | $ 28.74 | $ 29.35 | $ 28.56 | $ 29.33 | 3,332,400.00 | $ 29.33 |
| 203 | 6/29/2012 | $ 29.29 | $ 29.30 | $ 28.26 | $ 28.54 | 2,685,300.00 | $ 28.54 |
| 204 | 6/28/2012 | $ 28.63 | $ 29.21 | $ 28.01 | $ 28.52 | 5,229,700.00 | $ 28.52 |
| 205 | 6/27/2012 | $ 26.69 | $ 29.42 | $ 26.37 | $ 28.33 | 12,446,900.00 | $ 28.33 |
| 206 | 6/26/2012 | $ 26.57 | $ 26.80 | $ 25.67 | $ 26.39 | 1,703,100.00 | $ 26.39 |
| 207 | 6/25/2012 | $ 26.34 | $ 26.73 | $ 26.18 | $ 26.42 | 2,257,000.00 | $ 26.42 |
| 208 | 6/22/2012 | $ 26.46 | $ 26.70 | $ 26.00 | $ 26.51 | 2,429,900.00 | $ 26.51 |
| 209 | 6/21/2012 | $ 26.86 | $ 27.00 | $ 25.71 | $ 26.12 | 3,316,100.00 | $ 26.12 |
| 210 | 6/20/2012 | $ 27.15 | $ 27.23 | $ 26.53 | $ 26.87 | 1,847,100.00 | $ 26.87 |
| 211 | 6/19/2012 | $ 26.98 | $ 27.95 | $ 26.67 | $ 26.91 | 3,830,500.00 | $ 26.91 |
| 212 | 6/18/2012 | $ 25.98 | $ 27.22 | $ 25.85 | $ 26.74 | 3,630,200.00 | $ 26.74 |
| 213 | 6/15/2012 | $ 25.33 | $ 25.97 | $ 25.29 | $ 25.74 | 2,317,100.00 | $ 25.74 |
| 214 | 6/14/2012 | $ 24.88 | $ 25.75 | $ 24.60 | $ 25.33 | 2,243,300.00 | $ 25.33 |
| 215 | 6/13/2012 | $ 24.97 | $ 25.54 | $ 24.65 | $ 24.89 | 2,784,400.00 | $ 24.89 |
| 216 | 6/12/2012 | $ 24.42 | $ 25.19 | $ 24.23 | $ 24.96 | 1,679,500.00 | $ 24.96 |
| 217 | 6/11/2012 | $ 24.82 | $ 25.60 | $ 24.24 | $ 24.25 | 2,200,900.00 | $ 24.25 |
| 218 | 6/8/2012 | $ 23.90 | $ 24.59 | $ 23.57 | $ 24.45 | 1,347,100.00 | $ 24.45 |
| 219 | 6/7/2012 | $ 24.32 | $ 24.40 | $ 23.81 | $ 23.96 | 1,457,500.00 | $ 23.96 |
| 220 | 6/6/2012 | $ 23.95 | $ 24.03 | $ 23.64 | $ 23.98 | 1,131,300.00 | $ 23.98 |
| 221 | 6/5/2012 | $ 23.63 | $ 23.80 | $ 23.05 | $ 23.64 | 2,048,100.00 | $ 23.64 |
| 222 | 6/4/2012 | $ 23.67 | $ 23.82 | $ 22.84 | $ 23.68 | 1,562,700.00 | $ 23.68 |
| 223 | 6/1/2012 | $ 24.10 | $ 24.34 | $ 23.39 | $ 23.58 | 2,508,500.00 | $ 23.58 |
| 224 | 5/31/2012 | $ 24.56 | $ 24.83 | $ 24.05 | $ 24.79 | 2,100,300.00 | $ 24.79 |
| 225 | 5/30/2012 | $ 24.65 | $ 24.88 | $ 24.45 | $ 24.46 | 2,115,300.00 | $ 24.46 |
| 226 | 5/29/2012 | $ 24.69 | $ 24.98 | $ 24.25 | $ 24.89 | 1,651,600.00 | $ 24.89 |
| 227 | 5/25/2012 | $ 24.57 | $ 24.90 | $ 24.40 | $ 24.59 | 2,111,400.00 | $ 24.59 |
| 228 | 5/24/2012 | $ 24.76 | $ 24.80 | $ 24.18 | $ 24.77 | 1,562,100.00 | $ 24.77 |
| 229 | 5/23/2012 | $ 23.70 | $ 24.65 | $ 23.51 | $ 24.55 | 1,862,300.00 | $ 24.55 |
| 230 | 5/22/2012 | $ 23.81 | $ 24.36 | $ 23.51 | $ 23.96 | 2,842,600.00 | $ 23.96 |

|     | A | B | C | D | E | F | G |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 231 | 5/21/2012 | $ 22.64 | $ 23.67 | $ 22.21 | $ 23.62 | 4,043,600.00 | $ 23.62 |
| 232 | 5/18/2012 | $ 23.01 | $ 23.35 | $ 22.29 | $ 22.40 | 3,516,300.00 | $ 22.40 |
| 233 | 5/17/2012 | $ 24.28 | $ 24.31 | $ 22.89 | $ 22.90 | 2,696,200.00 | $ 22.90 |
| 234 | 5/16/2012 | $ 23.89 | $ 24.50 | $ 23.80 | $ 24.21 | 2,119,200.00 | $ 24.21 |
| 235 | 5/15/2012 | $ 23.76 | $ 24.39 | $ 23.52 | $ 23.76 | 2,878,500.00 | $ 23.76 |
| 236 | 5/14/2012 | $ 24.19 | $ 24.39 | $ 23.51 | $ 23.78 | 2,907,700.00 | $ 23.78 |
| 237 | 5/11/2012 | $ 23.06 | $ 24.78 | $ 23.01 | $ 24.70 | 6,899,600.00 | $ 24.70 |
| 238 | 5/10/2012 | $ 23.00 | $ 23.50 | $ 21.98 | $ 22.69 | 4,635,200.00 | $ 22.69 |
| 239 | 5/9/2012 | $ 22.63 | $ 22.97 | $ 22.18 | $ 22.75 | 1,804,200.00 | $ 22.75 |
| 240 | 5/8/2012 | $ 23.01 | $ 23.18 | $ 21.70 | $ 22.78 | 5,527,100.00 | $ 22.78 |
| 241 | 5/7/2012 | $ 22.80 | $ 23.75 | $ 22.42 | $ 23.58 | 2,328,600.00 | $ 23.58 |
| 242 | 5/4/2012 | $ 23.59 | $ 23.91 | $ 23.11 | $ 23.13 | 2,447,100.00 | $ 23.13 |
| 243 | 5/3/2012 | $ 24.44 | $ 24.49 | $ 23.55 | $ 23.68 | 2,454,800.00 | $ 23.68 |
| 244 | 5/2/2012 | $ 23.67 | $ 24.50 | $ 23.66 | $ 24.40 | 2,701,100.00 | $ 24.40 |
| 245 | 5/1/2012 | $ 24.34 | $ 24.64 | $ 23.80 | $ 24.18 | 2,585,200.00 | $ 24.18 |
| 246 | 4/30/2012 | $ 25.47 | $ 25.49 | $ 24.14 | $ 24.22 | 4,996,400.00 | $ 24.22 |
| 247 | 4/27/2012 | $ 24.47 | $ 26.75 | $ 24.47 | $ 25.15 | 10,853,000.00 | $ 25.15 |
| 248 | 4/26/2012 | $ 24.68 | $ 24.80 | $ 24.07 | $ 24.43 | 3,508,800.00 | $ 24.43 |
| 249 | 4/25/2012 | $ 22.75 | $ 24.49 | $ 22.70 | $ 24.23 | 6,980,100.00 | $ 24.23 |
| 250 | 4/24/2012 | $ 22.76 | $ 22.90 | $ 22.38 | $ 22.43 | 2,185,300.00 | $ 22.43 |
| 251 | 4/23/2012 | $ 22.66 | $ 22.80 | $ 22.37 | $ 22.70 | 2,140,500.00 | $ 22.70 |
| 252 | 4/20/2012 | $ 22.50 | $ 23.02 | $ 22.25 | $ 22.95 | 3,928,100.00 | $ 22.95 |
| 253 | 4/19/2012 | $ 22.41 | $ 22.79 | $ 22.12 | $ 22.19 | 3,534,000.00 | $ 22.19 |
| 254 | 4/18/2012 | $ 21.67 | $ 22.35 | $ 21.41 | $ 22.14 | 3,701,800.00 | $ 22.14 |
| 255 | 4/17/2012 | $ 22.02 | $ 22.02 | $ 21.55 | $ 21.67 | 3,362,900.00 | $ 21.67 |
| 256 | 4/16/2012 | $ 22.30 | $ 22.55 | $ 21.68 | $ 21.85 | 3,321,500.00 | $ 21.85 |
| 257 | 4/13/2012 | $ 22.17 | $ 22.25 | $ 21.97 | $ 22.14 | 3,825,400.00 | $ 22.14 |
| 258 | 4/12/2012 | $ 22.31 | $ 22.36 | $ 22.00 | $ 22.16 | 3,868,300.00 | $ 22.16 |
| 259 | 4/11/2012 | $ 21.88 | $ 22.29 | $ 21.55 | $ 22.22 | 5,474,800.00 | $ 22.22 |
| 260 | 4/10/2012 | $ 23.46 | $ 23.54 | $ 21.48 | $ 21.56 | 16,446,700.00 | $ 21.56 |
| 261 | 4/9/2012 | $ 22.48 | $ 23.11 | $ 22.13 | $ 22.92 | 9,841,000.00 | $ 22.92 |
| 262 | 4/5/2012 | $ 22.76 | $ 23.66 | $ 22.10 | $ 22.53 | 9,562,800.00 | $ 22.53 |
| 263 | 4/4/2012 | $ 22.11 | $ 22.45 | $ 21.52 | $ 22.37 | 6,673,300.00 | $ 22.37 |
| 264 | 4/3/2012 | $ 21.89 | $ 22.34 | $ 21.12 | $ 22.23 | 7,366,100.00 | $ 22.23 |
| 265 | 4/2/2012 | $ 23.00 | $ 23.10 | $ 21.55 | $ 21.72 | 6,223,000.00 | $ 21.72 |
| 266 | 3/30/2012 | $ 21.85 | $ 23.15 | $ 21.81 | $ 22.36 | 14,617,000.00 | $ 22.36 |
| 267 | 3/29/2012 | $ 19.61 | $ 23.75 | $ 19.55 | $ 21.28 | 30,805,600.00 | $ 21.28 |
| 268 | 3/28/2012 | $ 20.95 | $ 21.16 | $ 20.08 | $ 20.37 | 3,904,500.00 | $ 20.37 |
| 269 | 3/27/2012 | $ 21.03 | $ 21.15 | $ 20.24 | $ 20.85 | 5,472,200.00 | $ 20.85 |
| 270 | 3/26/2012 | $ 22.05 | $ 22.45 | $ 20.89 | $ 21.02 | 11,287,500.00 | $ 21.02 |
| 271 | 3/23/2012 | $ 20.79 | $ 21.59 | $ 20.68 | $ 21.31 | 4,130,500.00 | $ 21.31 |
| 272 | 3/22/2012 | $ 20.92 | $ 21.05 | $ 20.50 | $ 20.81 | 2,349,500.00 | $ 20.81 |
| 273 | 3/21/2012 | $ 20.81 | $ 21.68 | $ 20.79 | $ 21.09 | 3,756,300.00 | $ 21.09 |
| 274 | 3/20/2012 | $ 21.05 | $ 21.12 | $ 20.43 | $ 20.82 | 3,873,900.00 | $ 20.82 |
| 275 | 3/19/2012 | $ 20.24 | $ 21.68 | $ 20.13 | $ 21.13 | 7,233,000.00 | $ 21.13 |
| 276 | 3/16/2012 | $ 20.22 | $ 20.53 | $ 20.01 | $ 20.25 | 3,292,200.00 | $ 20.25 |

|     | A         | B       | C       | D       | E       | F             | G       |
|-----|-----------|---------|---------|---------|---------|---------------|---------|
| 277 | 3/15/2012 | $ 20.07 | $ 20.75 | $ 19.87 | $ 20.14 | 4,223,300.00  | $ 20.14 |
| 278 | 3/14/2012 | $ 20.10 | $ 20.90 | $ 19.80 | $ 20.05 | 3,366,100.00  | $ 20.05 |
| 279 | 3/13/2012 | $ 20.69 | $ 20.69 | $ 19.39 | $ 20.19 | 6,090,400.00  | $ 20.19 |
| 280 | 3/12/2012 | $ 20.43 | $ 20.88 | $ 20.11 | $ 20.25 | 3,421,400.00  | $ 20.25 |
| 281 | 3/9/2012  | $ 21.43 | $ 21.45 | $ 20.37 | $ 20.66 | 4,444,400.00  | $ 20.66 |
| 282 | 3/8/2012  | $ 21.50 | $ 21.65 | $ 20.90 | $ 21.25 | 3,824,600.00  | $ 21.25 |
| 283 | 3/7/2012  | $ 21.74 | $ 22.00 | $ 21.21 | $ 21.58 | 3,435,500.00  | $ 21.58 |
| 284 | 3/6/2012  | $ 20.33 | $ 21.63 | $ 20.07 | $ 21.52 | 10,199,100.00 | $ 21.52 |
| 285 | 3/5/2012  | $ 21.33 | $ 22.25 | $ 21.30 | $ 21.77 | 6,206,600.00  | $ 21.77 |
| 286 | 3/2/2012  | $ 22.16 | $ 22.64 | $ 21.55 | $ 21.64 | 8,146,200.00  | $ 21.64 |
| 287 | 3/1/2012  | $ 23.00 | $ 23.25 | $ 22.00 | $ 22.25 | 18,849,000.00 | $ 22.25 |
| 288 | 2/29/2012 | $ 22.54 | $ 23.48 | $ 21.76 | $ 22.50 | 17,651,900.00 | $ 22.50 |
| 289 | 2/28/2012 | $ 24.30 | $ 24.50 | $ 21.08 | $ 21.26 | 20,372,600.00 | $ 21.26 |
| 290 | 2/27/2012 | $ 22.93 | $ 25.14 | $ 22.91 | $ 23.78 | 34,926,800.00 | $ 23.78 |

Source: Yahoo! Finance                    7